BLACK CONSTRUCTION CORPORATION, Appellant, *v.* JOSHUA C. AGSALUD, Director of the Department of Labor and Industrial Relations, State of Hawaii; AMADO E. ROSALES and ROGER WIDDIFIELD, Appellees

NO. 7345

CIVIL NO. 54850

JANUARY 22, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ., RETIRED JUSTICES OGATA AND MENOR ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY NAKAMURA, J.

The question is whether a building contractor organized as a corporation under the laws of Nevada and engaged in construction activity on Guam is subject to the Hawaii Employment Security Law by virtue of HRS § 383-2(c).[1] Black Construction Corporation, a

---

[1] HRS § 383-2(c), in relevant part, reads:

(c) The term "employment" shall include the service of an individual who is a citizen of the United States, performed outside the United States (except in Canada or the Virgin Islands as provided in paragraph (5) of this subsection), after December 31, 1971 in the employ of an American employer or of this State or of any of its instrumentalities or of any of its political subdivisions (other than service which is deemed employment under the provisions of section 383-3 or the parallel provisions of another state's law) if:

(1) The employer's principal place of business in the United States is

wholly owned subsidiary of a Hawaii corporation, E.E. Black, Ltd., challenges a coverage determination made by the Unemployment Insurance Division of the Hawaii State Department of Labor and Industrial Relations (hereafter the Division), raising constitutional as well as statutory objections. But we agree with the decisions reached by the Division, the Referee for Unemployment Compensation Appeals, and the Circuit Court of the First Circuit that Black Construction Corporation (hereafter Black) is an employer responsible for contributions to the Unemployment Compensation Fund (hereafter the fund) maintained pursuant to HRS Chapter 383 and federal law.

## I.

In early 1975, Amado Rosales and Roger Widdifield filed claims for unemployment insurance benefits payable under HRS Chapter 383, the Hawaii Employment Security Law; the claims were premised upon past employment with Black on Guam. The Division determined the claimants were entitled to benefits as they met all conditions for benefit eligibility, including prior employment by a covered employer. Their employment on Guam, as well as that "of all the U. S. citizen-employees of Black Construction Corporation,"

---

located in this State; or

(2) The employer has no place of business in the United States, but

(A) The employer is an individual who is a resident of this State; or

(B) The employer is a corporation which is organized under the laws of this State; or

(C) The employer is a partnership or a trust and the number of the partners or trustees who are residents of this State is greater than the number who are residents of any one other state; or

(3) None of the criteria of paragraphs (1) and (2) of this subsection is met but the employer has elected coverage in this State or, the employer having failed to elect coverage in any state, the individual has filed a claim for benefits, based on such service under the law of this State.

(4) An "American employer", for purposes of this subsection, means a person who is:

(A) An individual who is a resident of the United States; or

(B) A partnership if two-thirds or more of the partners are residents of the United States; or

(C) A trust, if all of the trustees are residents of the United States; or

(D) A corporation organized under the laws of the United States or of any state.

was deemed "employment" within the meaning of HRS § 383-2(c) since it was service performed by American citizens for an American employer whose principal place of business in the United States was in Hawaii. And as there was no record of contributions to the fund by Black, a "Notice of Contributions Due" was also transmitted to the employer. The assessment was contested, and a full hearing on the coverage question was conducted by the Referee for Unemployment Compensation Appeals.

The Referee noted Black's organization as a corporation under the laws of Nevada but found Black neither maintained an office nor engaged in any construction activity there. He further found Black's activities were centered on Guam, it was not licensed to act as a building contractor in Hawaii, and it engaged in no construction in Hawaii. That Black filed its yearly corporate reports with the State of Nevada and not with Hawaii was recognized by the Referee. He nonetheless concluded Black was an employer subject to the Hawaii law and not Nevada's for unemployment insurance purposes.

The record made before the Referee indicates Black is part of a Hawaii-based enterprise which extends over the reaches of the Pacific Ocean from the State of Washington to Indonesia. While E.E. Black, Ltd., the parent corporation (hereafter E.E. Black), engages in construction under its own name in Hawaii, it has elected to carry on operations in Washington, Guam, the Trust Territory, the Philippines, and Indonesia through separately incorporated, wholly owned subsidiaries. But the policy direction for this far-flung business venture consisting of ostensibly separate corporations is furnished by the parent in Honolulu.[2]

---

[2] The pertinent testimony of Robert Chapman, a Black vice-president and also an officer of E.E. Black, reads in part:

Well, it doesn't only apply to Black Construction, it applies to other subsidiaries of E. E. Black where the corporation at the parent level where we establish certain policies, financial policies, reporting policies, engineering-type of policies and procedures, type of work to be bid on where it's into the private sector or whether to stay away from the private sector because it's looking weak, government sector, things of this nature and following the economy and things to do with how to protect ourselves in escalations and contracts. Recently, we set a policy for the corporation that stated that on all future bids we would put in the bid documents that it was subject to our being satisfied that the owner had financing, sufficient financing, proof of satisfaction to the contractor that the financing was there to complete the project.

The record manifests that four of Black's eight corporate officers are also officers of the parent corporation and the other subsidiary corporations. And these four officers who maintain offices and residences in Hawaii are responsible for setting policies and goals effective throughout the enterprise. While Black's day-to-day operations are controlled by its officers on Guam, the "guidelines" for the conduct of business there are established in Honolulu. E.E. Black also performs services from time to time for Black.[3] There is other evidence of frequent contact and a close relationship between parent and subsidiary. For example, three of Black's officers who live on Guam are on the E.E. Black payroll.

Evidence of Black's compliance with Nevada's Unemployment Insurance Law was also adduced before the Referee. The contention that Black and its American-citizen employees were covered for unemployment insurance purposes by the Nevada law, however, was overruled on the ground that the compliance was effected some ten months after Black was apprised of the applications for benefits by its former employees under Hawaii law. The Referee found Black's "principal place of business in the United States . . . [was] located in Hawaii" and concluded the Division's assessment of contributions against the employer was proper under HRS § 383-2(c)(1). An appeal from the administrative decision to the circuit court followed.

The circuit court reviewed the record made before the Referee and affirmed his decision that the employer was subject to the Hawaii law. The court, however, concluded the employment of American citizens by Black on Guam constituted "employment" within the meaning of the Hawaii Employment Security Law under HRS § 383-2(c)(1) and HRS § 383-2(c)(3).

## II.

Black initially asserts it is not engaged in business in the United States. But if it can be deemed to be so engaged, it claims the

---

[3] Mr. Chapman's testimony in this regard reads in part:

We do assist at times if they're overloaded among these areas [daily operational requirements] and need some engineering work. They need some shop drawings, things of that nature they can't get out in time; then they'll ask for our assistance or vice-versa. We might ask for theirs, but, whoever works at whoever's else's work is charged back for it.

principal place of the corporation's business in the United States is Nevada. Furthermore, the imposition of "an employment tax on a foreign corporation's employment of employees who perform no services in the taxing state," in Black's view, contravenes due process. A review of the record and the applicable law, however, convinces us the assessment of contributions was proper under the Hawaii and the federal laws relating to unemployment insurance and consistent with pertinent due process principles.

## A.

·Our review commences with an overview of the unemployment insurance system. The passage of the Social Security Act in 1935[4] "laid the foundation for a cooperative endeavor between the states and the nation" to meet the problem of unemployment, for the portions of the Act relevant here represented "an attempt to find a method by which the states and the federal government could 'work together to a common end.' " *Buckstaff Bath House Co. v. McKinley,* 308 U.S. 358, 363 (1939) (quoting *Steward Machine Co. v. Davis,* 301 U.S. 548, 588 (1937)). Although it recognized the "problem had become national in area and dimensions," *Steward Machine Co. v. Davis, supra,* at 586, Congress adopted a remedial expedient that actuated state action by imposing a federal payroll tax[5] on private employers but permitting tax credits of up to ninety per cent of the federal tax for their contributions to federally approved state unemployment compensation funds.[6] "That . . . [the Act] was designed so as to bring the states into the cooperative venture is clear. The fact that it would operate though the states did not come in does not alter the fact that there were great practical inducements for the states to become components of a unitary plan for unemployment relief." *Buckstaff Bath House Co. v. McKinley, supra,* at 363. "The federal Act . . . [was] obviously an invitation to the states to enter the field,"

---

[4] Pub. L. No. 74-271, 49 Stat. 620 (1935) (codified in scattered sections of 42 U.S.C.).

[5] The relevant provisions are now codified in the Internal Revenue Code as the Federal Unemployment Tax Act (26 U.S.C. § § 3301-3311).

[6] *See* 26 U.S.C. § 3302 (1970).

*Standard Dredging Corp. v. Murphy,* 319 U.S. 306, 310 (1943), and "a coordinated and integrated dual system" of unemployment insurance was established. *Buckstaff Bath House Co. v. McKinley, supra,* at 364.

The first major changes in this unified scheme were embodied in the Employment Security Amendments of 1970.[7] While the most consequential amendment probably was one that established a permanent federal benefit plan designed to operate in conjunction with the regular state programs to provide additional unemployment benefits for persons who exhaust their state benefits during periods of high unemployment, the changes effecting substantial extensions in the coverage of the federal-state program were also significant. The pertinent coverage extension was effected by amending the definition of "employment" as the term appears in the Federal Unemployment Tax Act[8] to include:

> any service, of whatever nature, performed after 1971 outside the United States (except in a contiguous country with which the United States has an agreement relating to unemployment compensation or in the Virgin Islands) by a citizen of the United States as an employee of an American employer.[9]

An "American employer" was defined to include "a corporation organized under the laws of the United States or of any State."[10]

---

[7] Pub. L. No. 91-373, 84 Stat. 695 (1970).

The Senate report accompanying the measure summarized its purposes as follows:

> The bill would extend the coverage of the unemployment compensation program to additional jobs, establish a permanent program of extended benefits for people who exhaust their regular State benefits during periods of high unemployment, provide the States with a procedure for obtaining judicial review of certain adverse determinations by the Secretary of Labor, improve the financing of the program, provide certain limited requirements for State unemployment compensation programs which are designed to protect the integrity of the program, and make other changes to strengthen the Federal-State unemployment compensation system.

S. Rep. No. 91-752, 91st Cong., 2d Sess. ____, *reprinted in* 1970 U.S. CODE CONG. & AD. NEWS 3606, 3607.

[8] If a person performs services constituting "employment" as defined, both he and his employer are covered by the Act.

[9] Now codified in 26 U.S.C. § 3306(c).

[10] Now codified in 26 U.S.C. § 3306(j)(3).

The obvious congressional design was to afford unemployment insurance coverage for "construction personnel employed overseas by American contractors engaged in overseas construction work" by stimulating state action to provide the protection.[11] That Congress expected prompt and favorable responses to the stimulus is also a matter of record.[12] And the "invitation" was subsequently reiterated by the agency charged with the administration of the federal aspects of the integrated program, the Unemployment Insurance Service of the United States Department of Labor, through specific proposals submitted to the states for possible legislative action.

Hawaii's response was prompt and predictable; HRS Chapter 383 was extensively amended in 1971 to accommodate changes in the federal law made by the Employment Security Amendments of

---

[11] The Senate report referred to earlier stated in part:

In recent years, the number of U.S. citizens working for American employers abroad has greatly increased, due primarily to the large number of construction personnel employed overseas by American contractors engaged in overseas construction work for the armed services. While the total number of individuals involved — approximately 160,000 — is a very small proportion of the total work force, it is a substantial number. When these individuals, after completing their work overseas, seek work in the United States, they are not eligible to receive unemployment benefits. Some States have become increasingly concerned over the problem. A State, however, may be reluctant to cover overseas contractors based in that State, because by doing so it may place the contractors operating out of that State at a competitive disadvantage in relation to contractors operating out of States which do not cover employment outside the United States.

The Federal unemployment tax has in the past been an effective device for removing interstate competition as an impediment to coverage by State laws. Because the credits against the Federal tax results in a combined net Federal and State tax lower, in most cases, than the full Federal tax, States have been prompt to extend State coverage to employment subject to the Federal tax and employers have been quick to seek State law coverage when they become subject to the Federal tax.

S. Rep. No. 91-752, 91st Cong., 2d Sess. ____, *reprinted in* 1970 U.S. CODE CONG. & AD. NEWS 3606, 3621.

[12] S. Rep. No. 91-752 also stated in pertinent part:

The bill would apply the Federal tax to the wages earned by individuals in overseas employment for American employers without specifying coverage in any State. It is anticipated that States will act to cover this type of employment, as they have in the past when other employers became subject to the Federal tax without being subject to the basic coverage provisions of any State law.

*Id.*

1970,[13] and the amendatory language followed these amendments and the suggestions for implementation prepared by the federal agency.[14] In text, HRS § 383-2(c) thus represents a nearly verbatim replication of those provisions of the federal Draft Legislation tailored to effect state unemployment insurance coverage of the overseas employment of American citizens by American employers.[15].

## B.

Black concedes it is an American employer for whom services have been performed outside the United States by American citizens and that it therefore is subject to the federal payroll tax imposed by 26 U.S.C. § 3301 (the Federal Unemployment Tax). But it contests coverage under HRS Chapter 383, claiming (1) the Hawaii Employment Security Law can not apply to a corporation incorporated under the laws of Nevada that does no business in the United States and (2) whatever may be due by way of state unemployment insurance contributions is owed to Nevada under provisions of the Nevada Unemployment Compensation Law paralleling HRS § 383-2(c)(2).[16]

---

[13] See S.L.H. 1971, c. 187, and Sen. Stand. Comm. Rep. No. 429, in 1971 Senate Journal 977. The committee report stated the purpose of the bill which became Act 187 as follows:

The purpose of this bill is to amend the Hawaii Employment Security Law in several respects to make it conform to new federal standards for state unemployment compensation laws enacted in P. L. 91-373, popularly known as the "Employment Security Amendments of 1970."

*Id.* at 977-78.

[14] See UNEMPLOYMENT INSURANCE SERVICE, U.S. DEPARTMENT OF LABOR, DRAFT LEGISLATION TO IMPLEMENT THE EMPLOYMENT SECURITY AMENDMENTS OF 1970 ... H.R. 14705 — TOGETHER WITH EXPLANATORY COMMENTARY (hereafter Draft Legislation).

[15] *Id.* at 9-10.

[16] HRS § 383-2(c)(2) reads in pertinent part:

(c) The term "employment" shall include the service of an individual who is a citizen of the United States, performed outside the United States . . . in the employ of an American employer . . . if:

   .   .   .   .

(2) The employer has no place of business in the United States, but

   .   .   .   .

(B) The employer is a corporation which is organized under the laws of this State.

Quoting familiar canons of statutory construction, it argues the relevant term, "place of business," cannot include Hawaii where Black and its business are concerned. That the headquarters of the enterprise of which it is a part are situated in Honolulu and that activity related to the business in Guam transpires there do not, in its opinion, render Hawaii a place where Black is engaged in business. For statutes imposing taxes, it contends, should be "strictly construed in favor of the taxpayer" and the words used therein "should be taken in their popular sense." Any reading other than a narrow one favoring the taxpayer, it also infers, "would create a substantial doubt as to the statute's constitutional validity." But we do not consider the foregoing canons controlling; nor do we believe Hawaii's assessment of unemployment insurance contributions against Black would engender "serious constitutional problems."

"[O]ur primary duty [in interpreting and applying statutes] is to ascertain the intention of the legislature and to implement that intention to the fullest degree." *Keller v. Thompson,* 56 Haw. 183, 189, 532 P.2d 664, 669 (1975). "[T]he rule of strict construction with regard to taxing statutes should only be resorted to 'as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the ambiguity have been exhausted.' *Bishop Trust Company v. Burns,* 46 Haw. 375, 399-400, 381 P.2d 687, 701 (1963)." *In re Hawaiian Telephone Co.,* 61 Haw. 572, 578-79, 608 P.2d 383, 388 (1980).

Black, however, discerns no ambiguity in the statute, asserts the words should be read in their "popular sense," and claims Guam is the only place where it conducts business. But "place of business" and "doing business" have lent themselves to many meanings as even a cursory review of relevant case law reveals. *See* 32A *Words and Phrases* 140-153 and *In re Heftel Broadcasting Honolulu,* 57 Haw. 175, 180 n.4, 554 P.2d 242, 246 n.4 (1976), *cert. denied,* 429 U.S. 1073 (1977).[17] Moreover, "[w]hen aid to construction of the meaning of words, as used in the statute is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may

---

[17] There, we said "that significantly more business activity is required for qualification purposes than for taxing jurisdiction."

appear on 'superficial examination.' " *United States v. American Trucking Associations,* 310 U.S. 534, 543-44 (1940) (footnotes omitted); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10 (1976). And when there is a plethora of material evidencing legislative purpose and intent, there is no reason for a court to seek refuge in "strict construction," "plain meaning," or "the popular sense of the words."

. 1.

HRS § 383-2(c), as we have seen, was enacted in 1971 to bring overseas employment of American citizens by American contractors within the ambit of the Hawaii Employment Security Law. It was passed to implement a decision by Congress to cover service performed outside the United States under the unitary system of unemployment insurance which was established by the Social Security Act.[18] The implementing language of Act 187, S.L.H. 1971, is also of federal derivation. *See* notes 14 and 15 *supra.* The expressions of purpose and intent in source material consisting of legislative reports and documents prepared by the agency charged with oversight of the federal aspects of the integrated system tell us that "place of business" necessarily has a broader connotation than the situs of a building contractor's activity abroad or the state under whose laws it may be organized as a legal entity.

In adopting the Employment Security Amendments of 1970, Congress assumed that an American employer engaged in business abroad ordinarily has an American base from which it operates.[19] Relevant provisions of the Draft Legislation described this "base" in

---

[18] That the interests furthered by the State legislative action are federal as well as local is obvious. Furthermore, the taxes collected from employers as a result of the expanded coverage of the Hawaii law are not part of the State's general revenues. The moneys collected are placed in a special fund and subsequently deposited in the federal unemployment trust fund established and maintained pursuant to § 904 of the Social Security Act, as amended. *See* HRS §§ 383-121 and 383-122. Benefit payments are made from the trust fund when claims for unemployment insurance benefits are made by eligible claimants who may or may not be residents of Hawaii.

[19] *See, e.g.,* note 11 *supra,* where a relevant portion of S. Rep. No. 91-752, 91st Cong., 2d Sess., is reproduced. A clear design to induce a state to expand the coverage of its law "to cover overseas contractors based in that State" is reflected there.

terms of "the employer's principal place of business in the United States." *See* Draft Legislation, at 9. The commentary thereon delineated the primary considerations in determining "principal place of business" as follows:

> The basic test applied is whether the employer's principal place of business in the United States is located in the State. If it is, the service is covered in that State. Principal place of business in the United States refers to the employer's headquarters in the United States, the business address where its highest officers in the United States are located. The employers of the great majority of U.S. citizens working for American employers outside the United States have a place of business in the United States. In some cases, however, an American employer may be physically located entirely outside the United States and have no place of business in the United States.

Draft Legislation, at 33-34. Hence, the governing federal-state scheme regards an overseas employer's American base as a "place of business"; it also contemplates that the employer will be brought into the integrated system under the laws of the state where its American headquarters are located.

The State Unemployment Insurance Division, the Referee for Unemployment Compensation Appeals, and the circuit court agreed Black was subject to the Hawaii Employment Security Law pursuant to HRS § 383-2(c)(1),[20] inasmuch as its highest officers are in Hawaii. We likewise encounter no difficulty in concluding Black has an American base and its "principal place of business in the

---

[20] HRS § 383-2(c)(1) reads in pertinent part:
   (c) The term "employment" shall include the service of an individual who is a citizen of the United States . . . in the employ of an American employer . . . if:
   (1) The employer's principal place of business in the United States is located in this State.
The circuit court also found Black was subject to the law by reason of HRS § 383-2(c)(3). We agree with the employer that this subsection is inapplicable because Black has a place of business in the United States. But "we have repeatedly held that where the . . . [lower] court has reached a correct conclusion, its decision will not be disturbed on the ground that the reasons it gave for its action were erroneous." Hawaii Carpenters' Trust Funds v. Aloe Dev. Corp., 63 Haw. 566, 578, 633 P.2d 1106, 1113 (1981); Federal Elec. Corp. v. Fasi, 56 Haw. 57, 64, 527 P.2d 1284, 1289-90 (1974); *accord*, Okuna v. Nakahuna, 60 Haw. 650, 656, 594 P.2d 128, 132 (1979); Cain v. Cain, 59 Haw. 32, 36, 575 P.2d 468, 472 (1978); Waianae Model Neighborhood Area Ass'n v. City & County, 55 Haw. 40, 43, 514 P.2d 861, 864 (1973).

United States is located in this State." For "the employer's head-quarters in the United States," from which its highest officers direct the corporation, are here.

### 2.

But Black contends the State's assessment of unemployment insurance contributions on service rendered abroad for a Nevada corporation contravenes due process. Viewing the contributions as an "employment tax" exacted for the privilege of hiring employees, it maintains the levy is fundamentally unfair as Black neither recruits, hires, nor has work performed by employees in Hawaii.[21] Given the nature of our system of unemployment insurance and the purpose and intent of HRS § 383-2(c), we can only conclude that the contentions lack merit.

Black professes to find primary support for its proposition in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and *In re Heftel Broadcasting Honolulu, supra.* In *International Shoe,* the Supreme Court upheld the State of Washington's imposition of an "employment tax" on a foreign corporate employer on the basis of substantial services rendered the employer by employees within the state. And in *Heftel,* we said jurisdiction to impose a privilege tax, the general excise, hinged upon a reasonable fiscal relationship between the tax and the protection, opportunities, and benefits afforded the taxpayer by the State. 57 Haw. at 182, 554 P.2d at 247. Since no construction worker performs service for Black in Hawaii and a tax-benefit nexus is not apparent, it argues the exaction of an "employment tax" in this case must perforce be invalid. We have no doubt that the cases proclaim sound principles of due process. Yet within the relevant statutory context, *International Shoe* lends no support to Black's cause and *Heftel* cannot be assigned controlling precedential weight.

The assessment against Black bears little or no relation to employment in Hawaii; it is related instead to employment in foreign commerce. What would otherwise be an unsupportable inva-

---

[21] Although it neither recruits, hires, nor has work performed by employees in Nevada, Black apparently does not consider a similar levy by Nevada fundamentally unfair.

sion of a congressional preserve, however, has been sanctioned by prior design. For Congress, in adopting the governing statutory scheme envisioned that the State would regulate interstate and foreign commerce "in specified ways." *International Shoe Co. v. Washington, supra,* 326 U.S. at 315.[22] Consistently therewith, the Employment Security Amendments of 1970 specifically authorized, indeed encouraged, the imposition of a burden on overseas employers who maintain contacts with Hawaii. The authorization, however, was subject to a condition that the moneys realized would be channeled into a federal trust fund for purposes related to the federal-state unemployment insurance program. *See* note 18 *supra* and HRS §§ 383-121 through 383-125. The nature of the assessment thus renders an application of the *Heftel* test to determine state taxing jurisdiction inapposite.

But the subjection of Black to liability for contributions still turns on an establishment of its "presence" in Hawaii. The Due Process Clause does not contemplate that a state may impose a tax on a corporation with which it has "no contacts, ties, or relations." *See International Shoe Co. v. Washington, supra,* 326 U.S. at 318-21. The operations or activities of the corporation as they are related to a claimed obligation must establish that it has "sufficient contacts or ties with the state . . . to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state to enforce" the obligation. *Id.* at 320. Black concedes the orderly administration of the phase of the unemployment insurance

---

[22] The Court's statement in this regard reads as follows:

Appellant's argument, renewed here, that the statute imposes an unconstitutional burden on interstate commerce need not detain us. For 53 Stat. 1391, 26 U.S.C. § 1606(a) provides that "No person required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate or foreign commerce, or that the State law does not distinguish between employees engaged in interstate or foreign commerce and those engaged in intrastate commerce." It is no longer debatable that Congress, in the exercise of the commerce power, may authorize the states, in specified ways, to regulate interstate commerce or impose burdens upon it. *Kentucky Whip & Collar Co. v. Illinois Central R. Co.,* 299 U.S. 334; *Perkins v. Pennsylvania,* 314 U.S. 586; *Standard Dredging Corp. v. Murphy,* 319 U.S. 306, 308; *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 679; *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769.

326 U.S. at 315.

53 Stat. 1391, 26 U.S.C. § 1606(a), is presently codified as 26 U.S.C. § 3305(a).

system at issue requires the exaction of contributions from overseas employers by one of the states. Since Black's American ties are with Hawaii and Nevada, the precise question is whether it would be reasonable and just for Hawaii, rather than Nevada, to enforce the obligation.

Black's "presence" in Nevada is premised upon its organization under the laws of that state.[23] The "presence," albeit a legal one, may be characterized as more fictional than factual.[24] By admission, the activities in Nevada are confined to the filing of statutorily mandated reports and the appointment of an agent through whom service of process upon the corporation may be effected. In contrast, Black's "presence" in Hawaii is a factual presence. Its parent and its highest ranking corporate fiduciaries are in Hawaii, corporate policies are determined here, and the parent performs services on its behalf here. Hawaii unquestionably serves as Black's American base of operations. It is reasonable and just for Hawaii to enforce the obligation in question, for Black has more significant contacts, ties, or relations with Hawaii than with any other American jurisdiction.[25]

Affirmed.

*Robert S. Katz (Carl M. Selinger* with him on opening brief; *Torkildson, Katz, Jossem & Loden,* of counsel) for appellant.

*Dwight Nadamoto (Carol K. Yamamoto* and *Edward E. Case,* Legal Intern, on the brief), Deputies Attorney General, for appellee Department of Labor & Industrial Relations, State of Hawaii.

---

[23] As Black claims to engage in no business in the United States, we have little doubt that its organizers selected Nevada as the place of incorporation for reasons not relevant here. But we have reason to believe Nevada was chosen for the same reason Delaware is so often a place of incorporation. It is no secret that "Nevada has attempted to become the western Delaware." Cary, *Federalism and Corporate Law: Reflections Upon Delaware,* 83 Yale L.J. 663, 665 (1974).

[24] *See* International Shoe Co. v. Washington, *supra,* 326 U.S. at 316.

[25] Our decision also raises no problem of comity as Nevada has indicated a willingness to defer to Hawaii in this matter.