DEP. OF FRED CRAWFORD, DEC., Claimant-Appellant, *v.*
FINANCIAL PLAZA CONTRACTORS and JOHN MULLEN
AND COMPANY, Employer, Insurance Carrier-Appellee, and
SPECIAL COMPENSATION FUND, Appellee

NO. 7349

CASE NO. AB 73-42 (70-14726)

MARCH 25, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY RICHARDSON, C.J.

The question on appeal is whether HRS § 386-33 (1976) ("section 33"),[1] a part of our workers' compensation statute, provides for the apportionment between an employer and the state special compensation fund of responsibility for payment of death benefits to a deceased employee's dependents where the employee's death results from a combination of work-related injury and disability

---

[1]

    If an employee receives an injury which of itself would cause a permanent partial disability but which, combined with a previous disability, results in a greater permanent partial disability or in permanent total disability, the employer shall pay compensation only for such disability as would have been caused by the injury without the previous disability. The employee shall be entitled to full compensation for his actual permanent partial or total disability, and, after receipt of the compensation payable by the employer, weekly payments of the balance of the compensation to which the employee is entitled shall be made out of the special compensation fund by orders of the director of labor and industrial relations.

preexisting employment. The Labor and Industrial Relations Appeals Board held that section 33 did not so provide. In light of the clear legislative intent in enacting the section to encourage the employment of disabled persons, we reverse.

## I.

In 1963, Fred Crawford was diagnosed as suffering from arteriosclerotic heart disease. In April 1968, he was hired as a hoist operator by Financial Plaza Contractors ("FPC"). In July 1968, while on the job, he suffered a severe heart attack, and died en route to the hospital. Following an autopsy, the medical examiner concluded that the cause of death was "[a]cute cardiac failure due to anterior coronary occlusion due to severe coronary arteriosclerosis."

Subsequently, Crawford's widow filed with the State Department of Labor and Industrial Relations ("DLIR") a dependents' claim for compensation on behalf of herself and a minor son. Mrs. Crawford alleged that her husband's death resulted from a "[h]eart attack caused by stresses of employment."[2] In February 1973, DLIR denied Mrs. Crawford's claim on the basis that Crawford's fatal heart attack resulted not from the stresses of employment but from the natural progression of arteriosclerosis.

Mrs. Crawford appealed DLIR's determination to the Labor and Industrial Relations Appeals Board ("Board"). Prior to the Board's decision, Mrs. Crawford and FPC reached a partial settlement, more fully discussed in n.12, *infra,* which determined the extent of FPC's liability to Mrs. Crawford. However, the settlement agreement, which was subsequently approved by the Board, reserved for the Board's consideration the question whether section 33 provided for the allocation to the special compensation fund ("SCF") of partial responsibility for payment of whatever death benefits were due Mrs. Crawford.

---

[2] As more fully discussed *infra,* our workers' compensation statute accords covered employees and/or their dependents the right to certain benefits if "an employee suffers personal injury [including death] either by accident arising out of and in the course of employment or by disease proximately caused or resulting from the nature of employment . . . ." HRS § 386-3 (1976).

The Board held a further hearing on the question of the applicability of section 33. At that hearing, all parties including the SCF stipulated that Fred Crawford's death was work-related such that his dependents were entitled to whatever death benefits the statute provided. But Mrs. Crawford, joined by FPC, argued that such benefits should be apportioned between the latter and the SCF. In turn, the SCF argued that section 33 provided for payment apportionment between an employer and the SCF only of disability benefits to an employee, not of death benefits to a deceased employee's dependents.

On November 28, 1978, the Board filed its decision. Citing its previous decision in *Dependents of Albert A. Keanini v. Boecon Hood,* 77-1 Hawaii Legal Rptr. 337 (L.I.R. App. Bd. Jan. 20, 1977), the Board concluded that "the SCF is not responsible for death benefits payable under Section 386-33, HRS."[3] It reasoned as follows:

> In upholding *Keanini,* the Board recently stated the following in *Survivors of James Kamaka v. Maui Land & Pineapple Co.,* Case No. AB 77-310(M) (November 1, 1978):
>
>> "The language of Section 386-33, HRS, and its legislative history clearly indicate that the Legislature did not intend to provide for Special Compensation Fund contribution in death cases to achieve the laudible [*sic*] objectives of the relevant statutory provision."
>
> The Board added that it "firmly believes that the issue is properly one for the Legislature to resolve."

Shortly thereafter, Mrs. Crawford appealed the Board's decision to this court.[4][5]

## II.

Our workers' compensation law was initially enacted in 1915. Act 221, 1915 Haw. Sess. Laws. In one of our first cases interpreting the statute, we noted that "[t]he administration of these laws necessitates

---

[3] The Board's *Keanini* decision was not appealed.

[4] Pursuant to HRS § 386-88 (Supp. 1981), Board decisions are appealable directly to this court.

[5] FPC, while technically an appellee along with the SCF, essentially joined Mrs. Crawford's appeal.

an appreciation of the legislative purpose to abolish the common law system relating to injuries to employees as inadequate to meet modern conditions and substitute therefor a system ... recognizing every personal loss to an employee, which is not self inflicted, as an element of the cost of production to be ... finally borne by the community in general." *Silva v. Kaiwiki Mill Co.*, 24 Haw. 324, 330 (1918). More recently, we noted that "[w]orkmen's compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. *Silva* ... [*,id.*] They represent a socially enforced bargain: the employee giving up his right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries." *Evanson v. University of Hawaii*, 52 Haw. 595, 598, 483 P.2d 187, 190 (1971).

Though the statute has been amended often, *see generally* S. Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii*, Legislative Reference Bureau, Report No. 1 (1963), at 7-16,[6] the nature and types of such statutory awards for which an employee or his dependents are eligible has not been altered significantly. Prof. Riesenfeld gave the following description of the benefit structure of compensation statutes generally, which description accurately depicts that of our own law:

[T]wo basic goals of compensation statutes are:

(a) to restore the injured worker, to the greatest possible extent, physiologically and as a productive member of society; and

(b) to compensate him or his family adequately for the losses consequent upon his personal injury or death.

Accordingly, the statutes provide for *medical and allied restorative benefits* needed to perform the first goal and for *income and indemnity benefits* designed to accomplish the second objective.

---

[6] The most extensive revision of the statute occurred in 1963. Act 116, 1963 Hawaii Sess. Laws at 103-28. The relevant legislative history states that "[t]he language of the bill in its amended form is based in large measure, though not exclusively, on the recodification of chapter 97 recommended by Dr. . . . Riesengeld [*sic*] . . . [in the report cited above.]" S. Stand. Comm. Rep. No. 334, 2d Hawaii Leg., 1st Sess. 1, *reprinted in Senate Journal* 788 (1963). Since the 1963 revision essentially remains in effect, Prof. Riesenfeld's report is a source to be accorded much deference in interpreting the statute.

> Income and indemnity benefits are either disability benefits or death benefits, depending on the effect of the compensable event. The disability for which income and indemnity benefits are payable may vary in extent and duration. Traditionally four categories of disability are differentiated, classified as permanent total disability, permanent partial disability, temporary total disability, and temporary partial disability.

*Id.* at 28. He also accurately noted that under our statute it is the employer who is primarily responsible for making the required compensation payments to employees or their dependents. *Id.* at 52.

Against this backdrop, we turn to the consideration of section 33. We note initially that the question we consider is purely one of statutory construction.[7] And in construing the section, the SCF urges that we look only to its "literal" meaning, without resorting to any aid in attempting to implement that which the Legislature wanted to implement other than the language of the statute itself.

Were we to construe this section in such a vacuum, we might find the SCF's interpretation of section 33 persuasive. But we have rejected an approach to statutory construction which limits us to the words of a statute, no matter how clear they may appear upon perfunctory review. In *Black Construction Corporation v. Agsalud,* 64 Haw. 274, 639 P.2d 1088 (1982), for example, we stated as follows:

> "Our primary duty [in interpreting and applying statutes] is to *ascertain the intention of the legislature* and to *implement that intention* to the fullest degree." *Keller v. Thompson,* 56 Haw. 183, 189, 532 P.2d 664, 669 (1975).
>
> . . . "[W]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " *United States v. American Trucking Associations,* 310 U.S. 534, 543-44 (1940) (footnotes omitted); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10 (1976). And when there is a plethora of material evidencing legislative purpose and intent, there is no reason for a court to

---

[7] Mrs. Crawford and FPC also raise certain due process and equal protection issues on appeal. We need not reach these objections in light of our resolution of the appeal on statutory construction grounds.

seek refuge in "strict construction," "plain meaning," or "the popular sense of the words."

(Emphasis added). Still more recently, we said:

> Where the letter of the law has produced a harsh result contrary to its intendment, we have not hesitated to eschew a strict interpretation and to seek meaning from its policy. *Hawaii Carpenters' Trust Funds v. Aloe Development Corp.,* 63 Haw. 566, 574, 633 P.2d 1106, 1111 (1981). For the Supreme Court teaches us:
>
> > The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes as *Holy Trinity Church v. United States,* 143 U.S. 457 illustrates. The process of interpretation also misses its high function if a strict reading of a law results in the emasculation or deletion of a provision which a less literal reading would be preserve.
>
> *Markham v. Cabell,* 326 U.S. 404, 409 (1945).

*Montalvo v. Chang,* 64 Haw. 345, 641 P.2d 1321 (1982) (footnote omitted).

We therefore have no hesitation in turning to sources other than the language of the statute itself to ascertain and implement the legislature's intent in enacting section 33. And in considering such sources, we note that since *Re Ichijiro Ikoma,* 23 Haw. 291, 295, 296 (1916), the first case in which this court addressed Hawaii's then-new workers' compensation statute, we have considered questions of construing that law with firm recognition of the humanitarian purpose for which it was enacted.

Section 33 was first enacted in 1937. Act 66, 1937 Haw. Sess. Laws, *codified at* RLH § 4417.5 (1945). Essentially, it provided that if an employee who had previously lost a hand or foot or eye subsequently sustained a second, work-related injury in which the other hand or foot or eye was lost, the employer at the time of the second injury would not be liable to the employee for compensation for the permanent total disability resulting from the combination of the first and second injuries, *e.g.,* the loss of both eyes. Instead, the employer's compensation liability would be limited to the permanent partial disability which the employee would have suffered had the second injury, *e.g.,* the loss of one eye, been the sole injury. The difference

between the employer's limited liability for the second injury and the total amount to which the employee was entitled because of his permanent total disability resulting from the combination of injuries was to be the responsibility of the special compensation fund created under the same act. The Legislature described the intent of the section as follows:

> The purpose of the bill is three-fold. It will provide (1) a better chance for employment to persons who unfortunately have already lost an eye, foot or hand; (2) it will tend to remove or lessen the discrimination engaged in by certain employers in employing only persons with no dependents; and (3) employers will be required to pay compensation only for the loss actually sustained in their employment.

> The bill accomplishes all these things without lessening the amount of compensation that the claimant receives under existing conditions.

S. Stand. Comm. Rep. No. 43, 19th Hawaii Terr. Leg. (1937), *reprinted in Senate Journal* 292, 293 (1937). *Accord:* H. Stand. Comm. Rep. No. 276, 19th Hawaii Terr. Leg. (1937), *reprinted in House Journal* 1354, 1355 (1937).

The section was amended in 1953 to expand its apportionment principle to include not just losses of eyes, feet and hands, but every case in which an employee received a second work-related injury which in itself would cause permanent partial disability, but which, in combination with a prior injury, resulted in permanent total disability. Act 98, 1953 Haw. Sess. Laws, *codified at* RLH § 97-27 (1955). The relevant legislative history provided as follows:

> The purpose of this bill is to enlarge the scope of the second injury fund by providing that permanent total disability resulting from *any* type of second injury may be compensated out of such fund after expiration of payment by the employer for such second injury. Under the present law only the loss of a hand, foot or eye following the previous loss of the other such member is compensable out of the fund. There have been only two cases of this kind in the thirteen years of the fund's existence.

> The Committee believes that increasing the effectiveness of the second injury fund may encourage the hiring of handicapped workers.

H. Stand. Comm. Rep. No. 457, 27th Hawaii Terr. Leg. (1953),

*reprinted in House Journal* 639 (1953) (emphasis added). *Accord:* S. Stand. Comm. Rep. No. 407, 27th Hawaii Terr. Leg. (1953), *reprinted in Senate Journal* 605 (1953); S. Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii, supra* at 13.

The section has not been substantively altered since 1953. The language was changed somewhat in the 1963 revision, but these were "slight changes . . . made to clarify the applicable rules." S. Stand. Comm. Rep. No. 334, 2d Hawaii Leg., 1st Sess. (1963), *reprinted in Senate Journal* 788, 791 (1963).

The Legislature's intent in enacting section 33 is clear: it wanted to encourage the hiring of persons already handicapped by preexisting permanent partial disabilities. The mechanism by which such encouragement was to be accomplished was to limit the liability of an employer of a previously handicapped worker who suffered a subsequent work-related injury to compensation for the subsequent injury alone. In this way, employers would not discriminate against previously disabled job applicants because of a fear that if such applicants were hired and subsequently suffered second work-related injuries, the employers would be responsible for the total injury. Instead, all job applicants effectively started healthy from the employer's perspective.[8]

---

[8] Further support for our conclusion regarding the legislative intent in enacting section 33 may be found by examining federal court interpretations of a nearly identical second injury provision in the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 908(f) (1978). As its title suggests, that statute provides a similar workers' compensation regime for certain injuries "occurring upon the navigable waters of the United States . . . ." 33 U.S.C.A. § 903(a) (1978). Because of such similarity, we have occasionally looked to the interpretations given that statute in interpreting our own. *E.g.* Akamine v. Hawaiian Packing & Crating Co., Ltd., 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972); and Lawhead v. United Airlines, 59 Haw. 551, 559, 584 P.2d 119, 124-25 (1978). In one such case, the United States Supreme Court, interpreting the federal act's second injury provision, stated as follows:

[O]ne of the major purposes of the second injury provision . . . [is] the prevention of employer discrimination against handicapped workers.

. . . .

. . . [In interpreting the second injury provision, w]e must look to the explanation of congressional intent behind the subsection. A witness at a hearing on the measure outlined his reasons for favoring the provision in the following manner:

"The second injury proposition is as much to the advantage of the employer and his interests as it is for the benefit of the employee. It protects that

With this intent in mind, we reach the question on appeal: where an employer hires a previously partially disabled worker and that worker subsequently suffers a second work-related injury which, in combination with the preexisting disability, proves fatal to the worker, is the employer liable for payment of all death benefits to which the statute entitles the deceased employee's dependents, or does section 33 provide for apportionment between the SCF and the employer in accordance with the respective contribution of each injury to death? This question may, we believe, be answered by posing the following rhetorical question: if, all other factors being equal, an employer was required to pay total death benefits to the dependents of an employee whose death was work-related, would he hire a healthy worker or a worker with a preexisting permanent partial disability which, combined with a subsequent work-related injury not in itself fatal, might result in the worker's death?

The fact that in such a situation the prudent employer so clearly would hire the healthy worker leads us to conclude that to interpret section 33 as inapplicable to death benefits would be to foster the very discrimination against handicapped workers that the section was designed to alleviate. We therefore hold that section 33 is applicable to death benefits. Where an employee with a permanent partial disability which preexists employment dies as a result of a combination of that preexisting disability and a subsequent work-related injury, the DLIR should determine the relative contributions of the two injuries to the cause of death.[9] The employer will bear responsibility for the amount of total death benefits commensurate

---

employer who has hired, say, a one-eyed worker who goes and loses his other eye and becomes a total disability. The employer without this sort of thing would have to pay total permanent disability compensation. Then, on the other hand, this also protects the worker with one eye from being denied employment on account of his being an extra risk. Now, by simply taking this up in this way it is possible to protect both the employer and to protect the one-eyed employee also."
Lawson v. Suwanee Fruit & Steamship Co., 336 U.S. 198, 201-02 (1948) (footnote omitted).

[9] We do not view whatever difficulty may exist in making such a determination as a compelling reason for reaching the opposite conclusion. The necessity of placing an objective value on disabilities arising from work-connected injuries is inherent in the operation of our workers' compensation statute.

with the contribution of the second injury. The remaining death benefits are the responsibility of the special compensation fund.[10] [11]

### III.

The decision of the Labor and Industrial Relations Appeals Board is reversed. The case is remanded to the Board for a determination of the relative contributions of the preexisting disability, arteriosclerosis, and the subsequent work-related injury, cardiac failure, to Fred Crawford's death. The SCF will be responsible for the portion of the total death benefits payable to Crawford's dependents which is proportionate to the relative contribution of the preexisting disability to death. FPC will be responsible for that portion attributable to cardiac failure, up to and including the $22,000 maximum settled upon between FPC and Mrs. Crawford.[12]

---

[10] At oral argument counsel for the SCF appeared to suggest that the applicability of section 33 to death benefits might depend on the time interval between the second work-related injury occurring subsequent to a preexisting injury, and the death of the employee as a result of the combination of the two. If counsel so argued, we reject such argument. Section 33 provides for the apportionment of whatever benefits our workers' compensation law otherwise provides where the compensable event results from a combination of preexisting disability and subsequent work-related injury. This is true whether such benefits are disability benefits payable to an employee, or death benefits payable to a deceased employee's dependents, or a combination thereof.

[11] At oral argument the question was raised whether the application of section 33 to death benefits would threaten the solvency of the SCF. This may have been a legitimate concern prior to the 1963 revisions when the SCF's primary source of funding was the collection of a portion of the death benefits otherwise due where a deceased employee left no dependents. See RLH § 97-99 (1955). It was this limited and unpredictable funding source combined with increasing demand on the SCF which lead Prof. Riesenfeld to urge as one of his four major recommendations for statutory revision that "[n]ecessary steps . . . be taken to reestablish and insure the continuing solvency of the special compensation fund." S. Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii, supra* at 91. The legislature adopted this recommendation primarily by enacting new sections which enable DLIR to levy on self-employed employers and on workers' compensation insurers whenever the SCF requires additional funds. See HRS §§ 386-152, 153 and 154 (1976).

[12] Under the settlement, Mrs. Crawford, in return for $22,000, agreed to "release and forever discharge . . . [FPC and its insurer] from any and all claims . . . [which Mrs. Crawford has ever had in connection with her husband's death.] In this regard, the SCF argues on appeal that if we hold section 33 to be applicable to death benefits, we should remand to DLIR for a redetermination of the settlement amount since the

If FPC's payments to Mrs. Crawford have included amounts for which the SCF is determined to have been responsible, FPC is entitled to reimbursement of such amounts from the SCF.

*Yvonne R. Shinmura (Steven Guttman* and *Elton John Bain* with her on the briefs) *(Guttman & Bain* of counsel) for claimant-appellant.

*Grant Kidani* for employer, insurance carrier-appellee.

*Kumu B. Vasconcellos* and *Noralynne K. Pinao (Molly Jo Campbell* on the brief), Deputy Attorneys General, for Special Compensation Fund, appellee.

---

SCF was not a party to such settlement. Were we to view the settlement between FPC and Mrs. Crawford as placing a $22,000 limit on the *total* death benefits payable to Crawford's dependents, we would do so. But we accept Mrs. Crawford's characterization of that settlement as merely placing a cap of $22,000 on the amount of FPC's liability for payment of death benefits to Crawford's dependents; it does not similarly affect whatever liability may be found to be SCF's. Of course, the other side of this coin is that if upon apportionment of the statutory death benefits payable to Crawford's dependents the responsibility of FPC is found to exceed $22,000, Crawford's dependents may not seek payment of the excess from the SCF.