904 P.2d 893

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Harry Hidenori TOYOMURA,
Defendant–Appellant.**

**No. 17973.**

Supreme Court of Hawai'i.

Oct. 11, 1995.

---

**10**

Samuel P. King, Jr., on the briefs, Honolulu, for defendant-appellant Harry Hidenori Toyomura.

Charlotte J. Duarte, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The defendant-appellant Harry Hidenori Toyomura was convicted in the district court of the first circuit of driving under the influence of intoxicating liquor (DUI), in violation of Hawai'i Revised Statutes (HRS) § 291–4(a)(1) (1993).[1] On appeal, Toyomura urges that the trial court erred in the following respects: (1) in denying his motion to dismiss the charge against him "on Double Jeopardy grounds"; and (2) in permitting a police officer to render opinions as to whether Toyomura had (a) failed his field sobriety test (FST), (b) exhibited a blood alcohol concentration (BAC) in excess of .10 percent, and (c) been intoxicated at the time of his arrest. For the reasons set forth below, we affirm.

## I. BACKGROUND

■ Toyomura was arrested for DUI after colliding with another vehicle on the H–1 freeway on the evening of October 21, 1993. Subsequently, his driver's license was re-

---

1. A person commits the offense of DUI, in violation of HRS § 291–4(a)(1), if he or she "operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty."

The record reflects that Toyomura was initially charged with DUI under both HRS §§ 291–4(a)(1) and 291–4(a)(2) (1993) (the latter being committed when a person "operates or assumes actual physical control of the operation of any vehicle with .10 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .10 or more grams of alcohol per two hundred ten liters of breath"). Because the police officer who transported Toyomura to the police station did not appear for trial and the police officer who apparently administered the intoxilyzer test measuring Toyomura's blood-alcohol concentration was ill, the prosecution elected to proceed only under HRS § 291–4(a)(1). *See generally State v. Mezurashi,* 77 Hawai'i 94, 881 P.2d 1240 (1994).

voked by the Administrative Driver's License Revocation Office (ADLRO), pursuant to Hawai'i Revised Statutes (HRS) chapter 286, Part XIV (1993) (Administrative Revocation Program).[2] Toyomura has sought judicial review of his administrative license revocation, see HRS § 286–260 (1993), and his appeal from the adverse decision of the district court is currently pending in this court under docket number 17845.[3] In the meantime, the State of Hawai'i (the prosecution) initiated proceedings to prosecute Toyomura criminally for DUI, pursuant to HRS § 291–4(a).[4]

On March 3, 1994, immediately prior to the commencement of his bench trial, Toyomura orally moved to dismiss the DUI charge against him on the ground that, as a prosecution "successive" to his administrative license revocation, it was barred by the constitutional right against double jeopardy.[5] Specifically, Toyomura argued that his previous administrative license revocation amounted to a "quasi criminal type proceeding" that foreclosed any subsequent criminal prosecution based on the same DUI offense.

The trial court denied Toyomura's motion on the basis that "what the [administrative license revocation process] does is not punishment. It merely removes the unsafe driver from the highway by not giving him his license. Whereas . . ., in the event that the

[prosecution] is successful [in the DUI prosecution], I can punish [Toyomura]." The case then proceeded to trial.

The first of the prosecution's three witnesses, Mary Williams, testified on direct examination that the family Saab automobile—which her husband was driving and in which she, her two children, and her father-in-law were passengers—was struck by Toyomura's pickup truck on the H–1 freeway, resulting in an accident on the evening of October 21, 1993. She explained that traffic congestion had forced them to come to a halt when, "all of a sudden, bam. I looked up at my husband and said, 'What happened?' And, he said we were hit, and he was looking at his rear view mirror. So, I turned around and looked, and I saw Mr. Toyomura in his truck." Williams's husband then exited the Saab, spoke with Toyomura, and returned to move the Saab out of traffic. Williams's husband parked near a concrete barrier, which was two and a half to three feet in height, and the family exited the Saab, climbed over the barrier to a grassy and presumably safer area, and waited for the police to arrive. Upon the arrival of the police, who parked their vehicle behind Toyomura's truck, the Williamses retraversed the concrete barrier to speak to the police. Toyomura, who had apparently joined the Williamses in the grassy area, likewise at-

---

2. For a detailed description of the Administrative Revocation Program, see *Kernan v. Tanaka*, 75 Haw. 1, 17–20, 856 P.2d 1207, 1216–17 (1993), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

3. Obviously, this opinion only disposes of the issues raised in Toyomura's criminal appeal, which is the matter immediately before us. The justices of this court express no opinion regarding the merits of No. 17845—Toyomura's appeal of his administrative license revocation—from which we are recused.

4. Because "an accused . . . faces the possibility of imprisonment" by virtue of the penalty provisions of HRS § 291–4(b) (1993), DUI is a "criminal offense," and the Hawai'i Rules of Penal Procedure govern prosecutions under HRS § 291–4(a). *State v. Lau*, 78 Hawai'i 54, 61, 890 P.2d 291, 298 (1995).

5. It is unclear whether Toyomura grounds his double jeopardy claim in the United States Constitution, the Hawai'i Constitution, or both. The

double jeopardy clause of the fifth amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb[.]" Analogously, article I, section 10 of the Hawai'i Constitution (1978) provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy[.]" However, we have not always construed the clauses as conterminous. *See, e.g., State v. Lessary*, 75 Haw. 446, 457–59, 865 P.2d 150, 155–56 (1994) (interpretation given to double jeopardy clause of fifth amendment by United States Supreme Court does not adequately protect individuals from being "subject for the same offense to be twice put in jeopardy," thus requiring additional protection under Hawai'i Constitution). However, insofar as the outcome of Toyomura's appeal is controlled by *State v. Higa*, 79 Hawai'i 1, 897 P.2d 928 (1995), which did not distinguish between the respective constitutional protections in the context of DUI and denied the appellant's claim on the basis of general "double jeopardy principles," *id.* at 7, 897 P.2d at 934, we need not consider whether the two constitutions diverge for present purposes.

tempted to climb over the barrier, but "fell over" it. Toyomura opted not to cross-examine Williams.

The prosecution's second witness, Honolulu Police Officer Arnold Samala, testified on direct examination that, when he arrived at the accident scene, he "saw two cars pulled over to the side and people ... standing on the other side of the barrier. And, as they approached me, ... I saw [Toyomura] climb over the barrier and he fell—fell to the ground." Officer Samala asked Toyomura for proof of auto insurance, Toyomura's driver's license, and the motor vehicle registration for his vehicle. Toyomura walked to his vehicle, retrieved the papers from the glove compartment, returned, and handed them over to Officer Samala. Officer Samala observed that: (1) Toyomura was unsteady on his feet; (2) an odor of alcohol emanated from Toyomura's mouth and chin; and (3) when he was moving Toyomura's vehicle further to the side of the freeway, there was a discernible odor of alcohol in the interior. On cross-examination, Officer Samala acknowledged that he had been dispatched to the scene after the accident had occurred and had therefore not witnessed it. Accordingly, he had no opportunity to observe the manner in which the drivers had operated their respective vehicles.

The prosecution's third witness, Honolulu Police Officer Craig Fujihara, who had accompanied Officer Samala to the accident scene, testified on direct examination that, from his police vehicle, he witnessed Toyomura "flip[ ] head-over-heels over [the] concrete barrier," landing on his side. Toyomura "then got up rather unsteadily, and ... walked over to a pickup truck," the side of which "he held on to ... for support." Officer Fujihara exited his vehicle, approached Toyomura, and "asked him if he was okay. He said yes." Officer Fujihara, who accompanied Toyomura while the latter complied with Officer Samala's request that he retrieve his identification papers from the pick-

up truck, was able to observe that: (1) Toyomura's "eyes were bloodshot"; (2) there was "a moderate odor of an alcoholic beverage on [Toyomura's] breath"; and (3) Toyomura "appeared to be unsteady on his feet," inasmuch as he (a) "couldn't stand," (b) "was swaying from side to side," and (c) "had to hold on to objects for support, such as the side of the truck, the door."

Officer Fujihara testified that he next instructed Officer Samala to move Toyomura's truck off the roadway to a safer place and that he did the same with the police vehicle. Returning to the accident scene, Officer Fujihara asked Toyomura if he would be willing to take a field sobriety test (FST), to which Toyomura agreed. The following colloquy ensued between the deputy prosecuting attorney (DPA) and Officer Fujihara regarding Fujihara's knowledge of prescribed procedures for administering FSTs:

Q [by the DPA:] Had you been trained in ... giving ... the field sobriety test?

A [By Officer Fujihara:] Yes, I have.

Q And, who had provided that training?

A My first training was with the ... people from NHSTA. This was in 19—it was '82. I was assigned to the Traffic Division. That was my first training. After that I received training from the Training Division in the standardized field sobriety testing.

Q Okay. And, for my own benefit, what is NHSTA?

A National Highway Safety Traffic Administration.

Q Is that the federal government or something else?

A I believe so, yes.[6]

Q Okay. Before giving [Toyomura] a field sobriety test did you ask [Toyomura] any questions?

A Yes, I did.

Q And, what were those questions?

6. Construed literally, Officer Fujihara's answer indicated that he believed that the NHSTA was, indeed, subsumed within "the federal government or something else," meaning that the NHSTA could have had *any* conceivable affiliation. However, we believe that the answer may fairly be deemed to convey Officer Fujihara's awareness of the NHSTA's relationship to the United States government. Nevertheless, we admonish all counsel to be sensitive to the records they create.

A I asked him if he was under any doctor's care. He replied no. I asked him if he was taking any medication[;] if he was a diabetic or epileptic; if he was under a dentist['s] care; if he had any physical disabilities that would hamper taking the test. He replied no to ... all of those.

Officer Fujihara testified that he then administered the horizontal gaze nystagmus, "one-leg stand," and "walk-and-turn" phases of the FST, but before he could describe the adequacy of Toyomura's performance of the horizontal gaze nystagmus phase, Toyomura objected,[7] and the trial court instructed the prosecution to "go on to the next test." The DPA asked Officer Fujihara to describe the instructions that he gave Toyomura regarding the one-leg stand procedure, but the defense again objected, *inter alia,* on the ground that the prosecution had not laid the proper foundation by first calling an expert to testify as to the significance of that phase of the FST.[8] Citing *State v. Nishi,* 9 Haw. App. 516, 852 P.2d 476 (1993), and *State v. Wyatt,* 67 Haw. 293, 687 P.2d 544 (1984), the trial court ruled that

> it [*i.e.,* the one-leg stand phase of the FST] is a valuable and reliable test. There is some question as to what foundation's necessary. I think the officer could establish the foundation. But, at this point, in any event, *I look only at ... the observations of the officer; not his grading of the test itself. It's just another way for me to take a look at the defendant through the officer's eyes.* So, I think under *State v. Nishi,* which ... was one of my cases, I ... assure [you that] *I will consider it only from a lay point of view.*

(Emphases added.)

Officer Fujihara was then permitted to testify regarding his administration of the one-leg stand and walk-and-turn procedures

and Toyomura's performance of them. With respect to the one-leg stand procedure, Officer Fujihara testified that he instructed Toyomura to "raise either his right or his left leg, keeping his leg approximately six to twelve inches above the ground, keeping the knee locked, and ... put[ting] his hands down by his sides[,]" and to count off thirty seconds. After nine seconds, Toyomura fell forward, put down his leg, and said, "I cannot do it any more." Officer Fujihara characterized Toyomura's performance as "unbalanced," and remarked that Toyomura's "ability to perform the test was very poor."[9]

Regarding the walk-and-turn procedure, Officer Fujihara instructed Toyomura to "place his right foot in front of his left, his arms down by his sides, and remain there until [Officer Fujihara] gave him instructions to proceed with the test," but Toyomura "could not hold that position." Under the circumstances, Officer Fujihara therefore instructed Toyomura to

> take nine steps heel-to-toe, making sure the heel of one foot touches the toe of the opposite foot. Try to walk a[s] straight a line as possible. Upon reaching the ninth step, pivot to the left, keeping the foot down planted on the ground, [and] come back in the same manner nine steps.

Toyomura attempted the walk-and-turn procedure, and the officer observed him take thirteen steps, of which four were "off to the side," and, as to the last four, "there was no heel to toe." When it came to the "pivot," Toyomura "just stopped [and] turned around." On the "walk back," Officer Fujihara observed that three of Toyomura's steps were "off to the side again." In sum, Officer Fujihara opined that Toyomura's balance and coordination during the walk-and-turn procedure were "not very good at all."[10]

---

7. Toyomura's objection was presumably based upon the lack of adequate foundation.

8. Toyomura also objected on the ground of relevance, asserting that he would establish on cross-examination that his foot was injured on the night of the accident and that he suffered from gout. Toyomura does not raise the trial court's disposition of this aspect of his objection as a point of error on appeal, and we accordingly

decline to address it. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (1995).

9. Toyomura did not object at trial to Officer Fujihara's assessment of his performance of the one-leg stand procedure.

10. Toyomura did not object at trial to Officer Fujihara's assessment of his performance of the walk-and-turn procedure.

**14**

At this point, Officer Fujihara testified that he placed Toyomura under arrest for DUI, and the following interchange transpired between the parties:

Q [by the DPA:] At the time you had placed defendant under arrest for driving under the influence did you have an opinion as to his state of sobriety?

A [by Officer Fujihara:] Yes, I did.

Q And, what was your opinion?

[Defense counsel:] Objection, Your Honor.... [T]he officer has testified about physical observations. That's for the Court to determine, for one thing. And, he's not an expert on sobriety ... or an expert in determining whether ... [the fact that] someone ... "fails these tests" or doesn't follow his directions means that the person is under the influence of anything. And, I don't know. Let's take ten people off the street and give 'em all those directions and see if they could follow 'em. Take the right number of steps and so on. That's for the Court to determine. So, I'd object to that opinion.

THE COURT: ... I'll overrule that. I think *any ... lay person can have an opinion regarding sobriety.* Officer, in ... your experience on the force have you had an opportunity to observe people who had been drinking and at different levels?

A [by Officer Fujihara:] Oh, yes, sir, I have.

THE COURT: How long have you been on the force?

A Approximately 19 ... years.

THE COURT: Okay. *Do you have an opinion about [Toyomura's] sobriety on that night?*

A Yes, I did.

THE COURT: You can tell me what it is.

A *My opinion was, based on* my observations and from *the results of the [FST],* I believed that *he was over the amount of alcohol that was allowed by law.*

Q [by the DPA:] Could you answer the same question without referring to any numerical or legal? How would you describe it?

A You're asking me to give a percentage, plus or minus? I would say that he was above a .10 ... reading.

Q Okay. And, just normal language for people unfamiliar with tests as such, how would you describe it?

A He was intoxicated.

[Defense counsel:] Well, again, same objection, Your Honor.

THE COURT: Okay. Intoxicated. That's your opinion?

A Yes, sir.

THE COURT: Okay.

(Emphases added.)

Following the close of the evidence and final argument by the parties, the trial court rendered its decision in relevant part as follows:

The accident certainly is some evidence that you weren't paying enough attention. But, in any event, that's not conclusive. That's not enough in and of itself. But, everything that I heard from Officer Samala and Officer Fujihara about your condition on that date tells me that you were drunk. Not just in a minor way, but that you were unsteady on your feet [at] virtually every opportunity to be unsteady. Your balance and coordination were very poor. Those are precisely the kinds of skills that you need to drive a car safely. It's a fairly complex set of behavior even though we take it for granted. You have to have hand, eye, foot coordination. And, everything about you that day, based on the descriptions I have, which I believe, tells me that you were just not in any shape to drive safely. And, in fact, you didn't. You got in an accident. You hit someone from behind.... [T]he fact is you were, in my mind, definitely intoxicated that night.

You drove a car. Your ability to drive safely and guard against casualty was impaired in a very substantial way.

I'm gonna find you guilty of the offense.

The trial court proceeded to sentence Toyomura as follows:

... I assume that [the] period of [your administrative license revocation] is over? Is that correct? Okay.

.... ... [M]y sentence ... is concurrent, so you don't get that added on. What I'm gonna do, Mr. Toyomura, is I'm gonna *require* an alcohol assessment, the 14–hour program, the 90–day suspension as required ...—all of those are concurrent and you need not repeat anything ... you've done already. So, I'm not doubling that up. I'm gonna impose in this case a fine of $200.00[.]

(Emphasis added.)

Toyomura filed a timely notice of appeal.

## II. *DISCUSSION*

### A. *Double Jeopardy*

■ The question whether the district court should have dismissed the DUI charge against Toyomura on double jeopardy grounds is a question of constitutional law that we review under the right/wrong standard of review. *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995); *State v. Gaylord,* 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995).

Relying on *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), and *Dow v. Circuit Court,* 995 F.2d 922 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 372 (1994), Toyomura makes the following argument:

... [P]rior to [his] criminal DUI trial in this case, [his driver's] license had been revoked in an ADLRO civil driver's license revocation proceeding.... As *required* by HRS [§ ]286–261(d) [ (1993) ] [11], [he] was *required* to be examined by a certified substance abuse counselor. In other words, as a result of the ADLRO proceeding, [he] had no choice but to be *required* to be in the presence of a substance abuse counselor for as long as it took to perform an examination. If the counselor's report, which was *required* to be submitted to the

[c]ourt, stated that [he] had a substance abuse problem, [he] would be *required* to obtain "treatment." There is no specification as to how long or extensive "treatment" might be. [HRS § 286–261(d) ] also *required* [him] to pay for examination and treatment.

There is no question that the *requirement* that [he] must submit to examination, at his own expense, by a certified substance abuse counselor, was a punishment akin to a criminal punishment.... The [*Dow* ] Court held that that the requirement that Dow submit to a fourteen hour class constituted "custody" for purposes of filing a federal habeas corpus action. The [c]ourt held that the requirement that Dow had to be somewhere was a restriction on his freedom and amounted to "custody." In this case, the *requirement* that [he, *i.e.,* Toyomura] had to submit to a certified substance abuse counselor's examination was clearly "custody" under the rationale of the *Dow* opinion. *There is no question that "custody" that amounts to foundation sufficient to file a federal habeas corpus proceeding is a type of criminal punishment.* In ... *Halper,* ... the United States Supreme Court held that once the defendant in that case had been [criminally] prosecuted for fraud, it was a Double Jeopardy violation to subject him to a civil action which amounted to additional punishment (in *Hapler* [sic] the additional punishment was a fine far in excess of any remedial amount[, thus rendering the fine] akin to a criminal penalty). The *Halper* court pointed out that the third prong of the Double Jeopardy protection forbad multiple punishments. The Court rejected the idea that a civil proceeding could not amount to a punishment.

In this case, [he, *i.e.,* Toyomura] was clearly punished when he was *required* to submit to an alcohol assessment at his own expense against his liberty. *Because [he]*

---

11. HRS § 286–261(d) provides:
 Whenever a license is administratively revoked under this part, the offender shall be referred to a certified substance abuse counselor for an assessment of the offender's alcohol abuse or dependence and the need for treatment. The counselor shall submit a report with recommenda-

tions to the director. If the counselor's assessment establishes that the extent of the offender's alcohol abuse or dependence warrants treatment, the director may so order. All costs for assessment and treatment shall be paid by the offender.

*suffered a punishment in his ADLRO license revocation proceeding, he could not again be subjected to a criminal DUI proceeding that submitted him to possible additional punishment.*

Toyomura's opening brief at 5–7 (emphases added).

As we will demonstrate *infra*, the logic of Toyomura's entire argument is specious for at least three reasons.

### 1. The "Higa propositions"

In *Higa, supra*, the defendant (Higa) appealed his DUI conviction and sentence, *inter alia*, on the ground that his prior administrative license revocation proceeding "barred a subsequent criminal prosecution under the principles of double jeopardy." 79 Hawai'i at 2–3, 897 P.2d at 929–30. Unlike the present matter, Higa's ADLRO proceeding culminated in his license revocation being reversed on the ground that Higa had requested, but had not been given, a blood alcohol test, with the result that there had been insufficient evidence to sustain the initial revocation. *Id.* at 3 & n. 2, 897 P.2d at 930 & n. 2. *See* HRS §§ 286–259(e) and (i) (1993). Thus, Higa argued that, inasmuch as his administrative hearing before the ADLRO had ended in his favor, any subsequent criminal prosecution for DUI was constitutionally barred. We disagreed and affirmed Higa's DUI conviction, pursuant to the following analysis:

Double jeopardy protects individuals against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *State v. Lessary*, 75 Haw. 446, 454, 865 P.2d 150, 154 (1994); *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Here Higa asserts that the first and third protections of double jeopardy have been violated.

With respect to the first protection, Higa seemingly argues that, because the ADLRO proceeding "ended in his favor," he should not be forced to undergo a second prosecution for the same offense. In other words, Higa implicitly equates "end-

ed in his favor" with an "acquittal," thus implicating the first protection enunciated in *Lessary* and *Halper*. However, because we conclude in the following discussion that the ADLRO proceeding does not bar a subsequent criminal prosecution, whether the ADLRO proceeding "ended in his favor" or resulted in an "acquittal" is immaterial. We therefore turn to the issue regarding multiple punishments for the same offense.

Higa argues that he is being exposed to multiple punishments for the same offense, and that, by permitting the government two chances to revoke his driving privileges via a civil administrative proceeding and a subsequent criminal prosecution, both the letter and the spirit of the protection that the double jeopardy clause was designed to ensure is violated.

. . . .

Both Higa and the prosecution rely on *Halper* to bolster their respective positions. We have previously had occasion to examine *Halper* in *Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 889 P.2d 705 (1995). . . . In examining the question of double jeopardy, we stated:

we view the *Halper* decision as applying mainly to prevent instances where the government seeks to extract monetary damages entirely unrelated to the goal of making the government whole in a civil proceeding from an individual who has already been "punished" in a criminal proceeding.

In the instant case, we are not analyzing the constitutionality of any monetary sanction designed to compensate the government for losses it sustained as a result of Loui's criminal actions. We are only looking at the . . . suspension of Loui's license to practice medicine. Thus, the *Halper* test, which "requires a comparison between the civil penalty and the government's loss resulting from the defendant's conduct" does not apply to the facts of this case. Instead, we must look more broadly at the principles enunciated in *Halper* to determine whether the . . . revocation of Loui's license to practice medicine constitutes a

second punishment for purposes of double jeopardy.

*Loui,* 78 Hawai'i at 27, 889 P.2d at 711 (citation omitted).

As in *Loui, Halper* does not apply to the present case because "we are not analyzing the constitutionality of any monetary sanctions designed to compensate the government for losses it sustained as a result of [the defendant's] criminal actions." *Loui,* 78 Hawai'i at 27, 889 P.2d at 711. Therefore, we must examine, as we did in *Loui,* the broader principles enunciated in *Halper* to determine whether the civil penalty sought in an ADLRO proceeding constitutes a "second punishment" violative of double jeopardy. *See Halper,* 490 U.S. at 448, 109 S.Ct. at 1901, ("punishment serves the twin aims of retribution and deterrence").

Revocation of an individual's driver's license appears to have a two-fold purpose. First, the procedure protects the public interest by removing potentially threatening drivers from our state's roadways; and, second, between the time offending drivers are cited and their criminal adjudication, the procedure precludes such drivers from continuing to drive. *See Kernan [v. Tanaka ],* 75 Haw. [1,] 29, 856 P.2d [1207,] 1221, *cert. denied,* —— U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994) ("In DUI cases, public safety is the main governmental concern.") As the legislature itself has stated:

> the main benefit of administrative revocation is that it allows the State to remove a drunk driver's license before the culmination of a lengthy prosecution under the criminal statute. Currently, a person charged with driving under the influence must be allowed to continue driving until he or she is found guilty in a court of law. This process takes an average of seven or eight months in Hawai'i, and even longer, and while this process is going on, the dangerous driv-

er, who quite likely is an inveterate repeat offender, remains on the road.

Hse.Conf.Comm.Rep. No. 137, in 1990 House Journal at 824[ ]; Sen. Conf.Comm.Rep. No. 137, in 1990 Senate Journal at 825.

Although license revocation may, from Higa's point of view, "carry the sting of punishment," *Loui* 78 Hawai'i at 27, 889 P.2d at 711 (citation omitted), as stated by the Supreme Court in *Halper,* "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry 'the sting of punishment.'" *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. ——, —— n. 14, 114 S.Ct. 1937, 1945 n. 14, 128 L.Ed.2d 767 (1994) (citations omitted). Rather, we must examine "the purpose actually served by the sanction in question[.]" *Loui,* 78 Hawai'i at 27, 889 P.2d at 711 (citation omitted). The vast majority of cases from other jurisdictions have held that the purpose of the administrative revocation process is not to "punish" those in Higa's position; it is to safeguard the public and reduce traffic fatalities caused by those driving while under the influence of alcohol.

. . . .

Based on the foregoing, we hold that Hawai'i's ADLRO proceedings serve legitimate, nonpunitive, and purely remedial functions, and, therefore, the administrative license revocation proceeding based on DUI did not bar Higa's subsequent criminal prosecution on the grounds of double jeopardy principles.

*Higa,* 79 Hawai'i at 5–7, 897 P.2d at 932–34 (footnotes omitted) (some brackets in original).

▇▇▇ Unlike Higa, Toyomura implicitly claims only the third double jeopardy protection enumerated in *Lessary* and *Halper,* namely, the protection against "multiple punishments for the same offense."[12] But, as in

---

12. At first blush, it might appear that Toyomura is also claiming the second *Lessary/Halper* protection against "a second prosecution for the same offense after conviction." However, on closer examination, it is clear that Toyomura does not assert, as such, that his ADLRO pro-

ceeding—which culminated in the revocation of his driver's license—is the predicate of his double jeopardy claim. Rather, Toyomura complains of the "punishment" (*i.e.,* the alleged "requirement that [he] must submit to examination, at his own expense, by a certified substance

*Higa,* Toyomura can derive no benefit from the *Halper* decision. First, the purely *potential* [13] costs of substance abuse assessment and treatment that Toyomura may face by virtue of his administrative license revocation, *see supra* note 11, in no way entail "any monetary sanctions designed to compensate the government for losses it sustained as a result of [his] criminal actions." *Higa,* 79 Hawaiʻi at 6, 897 P.2d at 933; *Loui,* 78 Hawaiʻi at 27, 889 P.2d at 711. Second, the Administrative Revocation Program, including the ADLRO hearing mechanism, is not "punitive" by its very nature, but rather "serve[s] [the] legitimate, nonpunitive, and purely remedial functions" of "safeguard[ing] the public and reduc[ing] traffic fatalities caused by those driving while under the influence of alcohol." *Higa,* 79 Hawaiʻi at 6–7, 897 P.2d at 933–34.[14] And therefore, third, Toyomura's subjective perception of the punitive character of the Administrative Revocation Program is immaterial, inasmuch "as even remedial sanctions carry 'the sting of punishment.'" *Id.* at 6, 897 P.2d at 933; *Kurth Ranch,* 511 U.S. at —— n. 14, 114 S.Ct. at 1945 n. 14.

2. *Toyomura fundamentally misconstrues HRS § 286–261(d), which does not "require" him to take any affirmative action.*

■ As we have indicated, Toyomura claims that, by operation of HRS § 286–261(d) [15], he was *"required* to be examined by a certified substance abuse counselor" (em-

phasis added), as a result of which he "would be *required* to obtain 'treatment'" (emphasis added), and that he would be *"required* to pay for [the costs of such] examination and treatment" (emphasis added).

■ To our knowledge, Toyomura's characterization of HRS § 286–261(d) accords us our first opportunity to interpret the section's legal effect. In doing so, "[t]he fundamental starting point . . . is the language of the statute itself." *AIG Hawaiʻi Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citation and internal quotation marks omitted). "The interpretation of a statute is a question of law which this court reviews *de novo.*" *State v. Ramela,* 77 Hawaiʻi 394, 395, 885 P.2d 1135, 1136 (1994) (citation omitted). "Moreover, where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *Id.* (citation and internal quotation marks omitted). "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Crosby v. State Dep't of Budget & Finance,* 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994), *cert. denied sub nom., Crosby v. Hawaiʻi,* —— U.S. ——, 115 S.Ct. 731[, 130 L.Ed.2d 635] (1995) (citation and internal quotation marks omitted). And "[w]e must read statutory language in the context of the entire statute and construe it in a manner

abuse counselor") that he "suffered" *as a result* of the ADLRO revocation proceeding. Toyomura's opening brief at 5–7. Thus, insofar as he argues that "[b]ecause [he] suffered a punishment in his ADLRO license revocation proceeding, he could not again be subjected to a criminal DUI proceeding that submitted him to possible *additional* punishment," *id.* at 7 (emphasis added), Toyomura suggests only that he has been subjected to "multiple punishments for the same offense."

13. *See infra* section II.A.2 of this opinion.

14. By contrast, there is no question that the $200.00 fine to which Toyomura was sentenced by virtue of his DUI conviction was punitive in character:

A fine . . . is a *"retributive* payment" due the sovereign. [*State v.*] *Murray,* 63 Haw. [12,] 16,

621 P.2d [334,] 337 [ (1980) ] (emphasis added). "When used appropriately, fines . . . advance *punitive* objectives[.]" ABA Standards [for Criminal Justice Sentencing (3d ed. 1994) ] § 18–3.16 commentary at 114 (emphasis added). "Whether one thinks of *punishments* in deterrent terms, with the economists, or in retributive terms, with the philosophers, there can in principle be no reason why the fine cannot serve as a credible *punishment* for nontrivial, indeed *serious* crimes." N. Morris and M. Tonry, *Between Prison and Probation* 112 (1990) (emphasis added). Thus, a fine punishes the offender financially[.]

*State v. Gaylord,* 78 Hawaiʻi 127, 152, 890 P.2d 1167, 1192 (1995) (emphases in original).

15. *See supra* note 11.

consistent with its purpose." *Franks v. City and County of Honolulu*, 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) (citation omitted).[16]

" 'When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute[,] an ambiguity exists.' " *Mehau v. Reed*, 76 Hawai'i 101, 109, 869 P.2d 1320, 1328 (1994) (quoting *Franks*, 74 Haw. at 335, 843 P.2d at 671). Put differently, a statute is ambiguous if it is "capable of being understood by reasonably well-informed people in two or more different senses." 2A N. Singer, *Sutherland Statutory Construction* § 45.02 at 6 (5th ed. 1992). . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) (1985). Moreover, "[t]he courts may resort to extrinsic aids in determining the legislative intent." *State v. Mundell*, 8 Haw.App. 610, 616, 822 P.2d 23, 27 (citing *Crawford v. Financial Plaza Contractors*, 64 Haw. 415, 643 P.2d 48 (1982)), *cert. denied*, 72 Haw. 619, 841 P.2d 1075 (1991). One avenue is the use of legislative history as an interpretive tool. *Pacific Int'l Services Corp. v. Hurip*, 76 Hawai'i 209, 217, 873 P.2d 88, 96 (1994); *Franks*, 74 Haw. at 335, 843 P.2d at 671–72.

*Housing Finance and Development Corp. v. Castle*, 79 Hawai'i 64, 76–77, 898 P.2d 576, 588–89 (1995) (brackets in original).

■ We begin our construction of HRS § 286–261(d) by addressing its first sentence—"[w]henever a [driver's] license is administratively revoked under [the Administrative Revocation Program], the offender *shall* be *referred* to a certified substance abuse counselor for an assessment of the offender's alcohol abuse or dependence and

the need for treatment." (Emphases added.) In essence, the question is whether the statutory phrase "shall be referred" is mandatory or merely directory, bearing in mind that, in either event, it is only for "an assessment" of possible alcohol abuse or dependence and the possible need for treatment—*i.e.*, a "needs assessment"—that "the offender shall be referred."

The word "referred" is neither defined in HRS § 286–251 (1993), which is the "definitions" section of the Administrative Revocation Program, nor anywhere else in the statutory scheme. Thus, we must determine whether its meaning is "plain and obvious." The verb to "refer" is defined both transitively and intransitively. The transitive definition includes "to direct for information or anything *required* " (emphasis added), as in "He referred me to books on astrology," and "to hand over or submit for information, consideration, decision, etc.," as in "to refer the argument to arbitration." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1205 (1989). The former definition may connote either a mandatory or directory quality, whereas the latter would seem to be mandatory. The intransitive definition includes "to *direct* anyone for information, esp[ecially] about one's character, abilities, etc." (emphasis added), as in "to refer to a former employer for a recommendation," and "to have recourse or resort; turn, as for aid or information," as in "to refer to one's notes." *Id.* The former of these definitions could potentially be either mandatory or directory, while the latter would appear to be purely discretionary. Accordingly, insofar as it is "capable of being understood by reasonably well-informed people in two or more different senses," the meaning of the term "referred" is not "plain and obvious," but, rather, is ambiguous.

With regard to the term "shall," we have long subscribed to the view that

16. Correlatively,
"[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (citing HRS § 1–16 (1985)

and *Kam v. Noh*, 70 Haw. 321, 325, 770 P.2d 414, 417 (1989)), *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994).
*Dines v. Pacific Ins. Co.*, 78 Hawai'i 325, 331, 893 P.2d 176, 182, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995) (internal quotation marks omitted).

[t]he use of the word "shall" in [a] statute is *not dispositive of the issue* ... whether the statute is mandatory rather than directory. While the word "shall" is generally regarded as mandatory, in certain situations it may properly be given a directory meaning. In determining whether a statute is mandatory or directory[,] the intention of the legislature must be ascertained. The legislative intent may be determined from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other. In general, a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them.

*Jack Endo Elec., Inc. v. Lear Siegler, Inc.,* 59 Haw. 612, 616–17, 585 P.2d 1265, 1269 (1978) (citations, internal quotation marks, and ellipsis points omitted). *See also Perry v. Planning Comm'n of County of Hawai'i,* 62 Haw. 666, 677, 619 P.2d 95, 103 (1980) (ruling that word "shall" may be merely directory when no advantage is lost, when no right is destroyed, or when no benefit is sacrificed, either to the public or to the individual).

 As we have noted, the global purposes of the Administrative Revocation Program are "to safeguard the public and reduce traffic fatalities caused by those driving while under the influence of alcohol" by "removing potentially threatening drivers from our state's roadways" and by "preclud[ing] such drivers from continuing to drive" between the time they are cited and their criminal adjudication. *Higa,* 79 Hawai'i at 6, 897 P.2d at 933; *Kernan,* 75 Haw. at 29, 856 P.2d at 1221. *See also* Hse.Conf.Comm.Rep. No. 137, in 1990 House Journal, at 824 ("The purpose of this bill is to provide for the public safety by establishing a quick, administrative procedure for revoking the licenses of drunk drivers while they are awaiting trial on criminal DUI charges under [HRS § ]291–4[.]"); Sen.Conf.Comm.Rep. No. 137, in 1990 Senate Journal, at 825 (*id.*); Hse. Stand.Comm.Rep. No. 1191, in 1989 House Journal, at 1269 ("The purpose of this bill is

to provide for the prompt revocation of the driver's license *of a person who a police officer has probable cause to believe has been driving under the influence of intoxicating* liquor."); Hse.Stand.Comm.Rep. No. 1071, in 1989 House Journal, at 1229 (*id.*); Sen. Stand.Comm.Rep. No. 355, in 1989 Senate Journal, at 955 ("The purpose of this bill is to provide for a mandatory revocation of a driver's license of a person, who the police has [sic] probable cause to believe ... was driving under the influence of intoxicating liquor."); Sen.Stand.Comm.Rep. No. 670, in 1989 Senate Journal, at 1062 ("The purpose of this bill is to provide for an administrative revocation of a person's license if there is probable cause to believe that the person was driving under the influence of intoxicating liquor (DUI).").

On the other hand, we must read the provisions of HRS § 286–261(d), which deals with a consequence of administrative revocation, "in the context of the entire [Administrative Revocation Program] and construe it in a manner consistent with its purpose." *Castle,* 79 Hawai'i at 77, 898 P.2d at 589. Accordingly, we construe HRS § 286–261(d) in pari materia with HRS § 286–265 (1993), which deals with "eligibility for relicensing." *See supra* note 16. HRS § 286–265 provides:

> **Eligibility for relicensing.** To be eligible for relicensing after a period of administrative revocation has expired, the person shall:
>
> (1) *Submit proof to the [ADLRO] of compliance with all conditions imposed by the [ADLRO]* or by the court;
>
> (2) Obtain a certified statement from the [ADLRO] *indicating eligibility for relicensing;*
>
> (3) Present the certified statement to the appropriate licensing official; and
>
> (4) Successfully complete each requirement for obtaining a new license in this State including payment of all applicable fees.

(Emphasis added and bold in original.)

By its plain language, HRS § 286–265 establishes the statutory mechanism for the

relicensing of a person who has been subject to the Administrative Revocation Program. One prerequisite to relicensing is "compliance with all conditions imposed" by the ADLRO. HRS § 286–265(1). The legislative history underlying the Administrative Revocation Program leaves no doubt that compliance with the needs assessment referral and completion of any treatment ordered pursuant to HRS § 286–261(d) are conditions subsumed within HRS § 286–265(1). *See* Hse.Conf.Comm.Rep. No. 137, in 1990 House Journal, at 825 ("[C]onditions that may be imposed include alcohol counseling and treatment.... After a revocation period is over, the person, in order to ever drive again in [Hawai'i], will have to prove that all conditions of the revocation have been met[.]"); Sen.Conf.Comm.Rep. No. 137, in 1990 Senate Journal, at 826 (*id.*); Sen.Stand Comm.Rep. No. 670, in 1989 Senate Journal, at 1063 ("[A] person whose license is revoked administratively ... may reapply ... for a license upon the expiration of the revocation period and upon compliance with the requirement that a person whose license is revoked obtain and remain in treatment for substance abuse[.]").

> This court has recognized that
>
> [a] driver's license is a constitutionally protected interest and due process must be provided before one can be deprived of his or her license. *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). Although driving is a "privilege" rather than a constitutional "right," once conferred, a license becomes a constitutionally protected property interest. *Illinois v. Batchelder,* 463 U.S. 1112, 1116–17, 103 S.Ct. 3513, 3515–3516, 77 L.Ed.2d 1267 (1983); *Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1978) *Dixon v. Love,* 431 U.S. 105, 112, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1976); *Bell,* 402 U.S. at 539, 91 S.Ct. at 1589[.]

*Kernan,* 75 Haw. at 21–22, 856 P.2d at 1218 (footnote omitted). The legislative history underlying the Administrative Revocation Program is in accord. *See* Hse. Conf.Comm.Rep No. 137, in 1990 House Journal, at 825 ("Revocation is not a suspension; it is an absolute removal of a person's privilege to drive in this State[.]"); Sen.

Conf.Comm.Rep. No. 137, in 1990 Senate Journal, at 826 (*id.*); Sen.Stand.Comm.Rep. No. 670, in 1989 Senate Journal, at 1062 ("In the past[,] there ha[ve] been concerns expressed over similar bills that insufficient due process protections were provided for drivers facing revocation proceedings. Your Committee finds that this bill provides a number of protections to the driver[.]").

Because the "privilege" of driving, once conferred, ripens into a constitutionally protected property interest, thereby entitling the driver to procedural due process, *see Kernan,* 75 Haw. at 22–24, 856 P.2d at 1218–19, before his or her license may be revoked, it therefore follows that failure of the ADLRO to "refer" an offender to a certified substance abuse counselor for a needs assessment, as provided in HRS § 286–261(d), would, at the very least, result in a "sacrifice" of a statutory "benefit," *see Perry,* 62 Haw. at 677, 619 P.2d at 103, or, put differently, an "injury," *see Jack Endo Elec.,* 59 Haw. at 617, 585 P.2d at 1269, to the offender's constitutionally protected property interest. This is the case because, pursuant to HRS § 286–265(1), the offender's eligibility for relicensing is conditioned, *inter alia,* upon compliance with the assessment and treatment options enumerated in HRS § 286–261(d). Accordingly, based on the analysis set forth above, we hold that HRS § 286–261(d) *mandates* that "[w]henever a [driver's] license is administratively revoked under the [Administrative Revocation Program], the offender shall be *referred* to a certified substance abuse counselor for a [needs] assessment[.]" (Emphasis added.)

The question remains, however, whether (as Toyomura contends) an offender, whose driver's license is administratively revoked, is *required* to submit to the needs assessment or to incur the costs and derive the benefits of the potential treatment for alcohol abuse or dependence for which provision is made in HRS § 286–261(d). In this connection, we note that the purposes of the statutorily authorized assessment and treatment are to decrease the incidence of "death, injury, and untold personal tragedy" caused by DUI and to "assist those in need of counseling to obtain professional help," Hse.

Stand.Comm.Rep. No. 1191, in 1989 House Journal, at 1269, in order to insure that an offender's "alcohol problem is under control and that it will be reasonably safe to permit the [offender] to drive a motor vehicle upon the highways" before the offender is permitted to reapply for a driver's license pursuant to HRS § 286–265. Sen.Stand.Comm.Rep. No. 670, in 1989 Senate Journal, at 1063.

The answer to the question lies in the self-evident fact that, once his or her driver's license is administratively revoked, an offender is under no obligation to apply for the privilege of relicensure. As we have demonstrated, the needs assessment and treatment provisions of HRS § 286–261(d) are essentially remedial; through them, the Administrative Revocation Program seeks to rehabilitate the former offender before issuing him or her a new driver's license, thereby safeguarding the public by reducing the incidence of traffic fatalities, injuries, and other "untold personal tragedy." Although, pursuant to HRS § 286–261(d), the ADLRO has a mandatory duty to *refer* an offender to a certified substance abuse counselor, the offender has no concurrent, mandatory duty to submit himself or herself to anything. Thus, if an offender wishes to avoid undergoing a needs assessment and any resulting treatment, he or she may simply elect not to comply with a referral order. However, insofar as a counselor's report and recommendations and an offender's compliance therewith are preconditions to relicensure, *see* HRS § 286–265, the offender will pay a price for his or her election because he or she will be unable to obtain the privilege of a new driver's license. Accordingly, submitting to a needs assessment and successfully completing any ordered treatment for drug abuse or dependence are merely conditions to be met if a former offender wishes to have his or her driving privileges renewed.

Inasmuch as HRS § 286–261(d) "requires" Toyomura neither to submit to the needs assessment to which he has been "referred" nor to undergo any treatment for alcohol abuse or dependence, we hold that its application to him, in combination with his DUI conviction and sentence pursuant to HRS § 291–4(a)(1), does not impose "multiple punishments for the same offense" as proscribed by the constitutional right against double jeopardy.

### 3. *Toyomura's reliance on the Dow decision is misplaced.*

As a final matter, Toyomura invokes *Dow, supra,* in support of his contention that "[b]ecause [he] suffered a punishment in his ADLRO license revocation proceeding, he could not again be subjected to a criminal DUI proceeding that submitted him to possible additional punishment" without violating double jeopardy principles. For the reasons discussed below, Toyomura's reliance on *Dow* is misplaced.

In *Dow,* the defendant (Dow) was convicted in a Hawai'i state court of DUI and was sentenced, *inter alia,* to fourteen hours of attendance at an alcohol rehabilitation[17] program. Following his unsuccessful appeal, Dow sought habeas corpus relief in the United States District Court for the District of Hawai'i "on the ground that, in obtaining his conviction, the state had violated the Double Jeopardy Clause." *Dow,* 995 F.2d at 923.[18] The district court denied Dow's petition, holding that it lacked jurisdiction to entertain it because the mandatory class attendance to which Dow was sentenced did not amount to a sufficient restraint on his liberty to constitute "custody" within the meaning of the applicable federal statute. *Id.* at 922.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed the district court's decision, reasoning as follows:

To invoke federal habeas corpus review, the petition must be "in behalf of a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(a). *The only question before us is whether the requirement of class attendance amounts to "custody" under 28 U.S.C. § 2254(a).*

---

17. "Rehabilitation" and "punishment" are distinct penal objectives. *See Gaylord,* 78 Hawai'i at 137–38 & nn. 33 and 36, 890 P.2d at 1187–88 & nn. 33 and 36; *see also* HRS §§ 706–606(2)(a) and 706–606(2)(d) (1993).

18. The *Dow* opinion did not identify the basis of Dow's double jeopardy claim, and, in any event, the *Dow* court did not address or resolve it.

Although [Dow] is not subject to incarceration, the custody requirement of section 2254 may be met even if the petitioner is not physically confined. A petitioner on parole, for example, is "in custody" within the meaning of section 2254, because the parole restrictions significantly restrain [the] petitioner's liberty to do those things which in this country free men are entitled to do. Similarly, a petitioner who is released on his own recognizance pending appeal is also "in custody" due to the conditions imposed on [the] petitioner as the price of his release. Therefore, to satisfy the custody requirement, [a] petitioner must demonstrate that he is subject to a significant restraint upon his liberty not shared by the public generally.

The *sentence* in this case, *requiring* [Dow's] physical presence at a particular place, significantly restrains [his] liberty to do those things which free persons in the United States are entitled to do and therefore must be characterized, for jurisdictional purposes, as "custody." [Dow] cannot come and go as he pleases. Moreover, [Dow] suffers a greater restraint upon his liberty—*mandatory class attendance*—than the restraint suffered by a person who is released upon his own recognizance. Because [Dow] is in custody within the meaning of 28 U.S.C. § 2254, he is entitled to invoke federal habeas corpus jurisdiction.

*Id.* at 923 (citations and internal quotation marks omitted) (emphases added).

Although somewhat obscurely articulated in his opening brief, Toyomura's argument seems to be as follows: (1) by virtue of his administrative license revocation, he was *required* to undergo a needs assessment and possible treatment for alcohol abuse or dependence, the costs of which he would be obliged to incur; (2) these "requirements" were akin to a criminal punishment and, pursuant to *Dow*, constituted "custody"; (3) "custody" is the functional equivalent of "punishment"; (4) the DUI conviction placed him at risk of "possible additional punishment"; and, therefore, (5) he has been subjected to "multiple punishments for the same offense," in contravention of the constitutional right against double jeopardy.

The logic of Toyomura's argument is sheer sophistry, and *Dow* is completely inapposite. First, the Administrative Revocation Program in general, and HRS § 286-261(d) in particular, did not affirmatively "require" Toyomura to do anything. *See supra* section II.A.2. Second, Toyomura's ADLRO proceeding served "nonpunitive [ ] and purely remedial functions," *Higa,* 79 Hawai'i at 7, 897 P.2d at 934, and he has suffered no "punishment" as a result of it. *See supra* section II.A.1. Third, the *Dow* paradigm was merely that a *criminal DUI sentence,* involving a *mandatory* restraint upon a person's freedom of movement, entailed "custody" and, thus, properly implicated federal habeas corpus jurisdiction—a proposition utterly irrelevant to the present appeal. Fourth, neither *Dow* nor, to our knowledge, any other authority suggests that "custody," without more, is synonymous with "punishment" in the double jeopardy context. And fifth, although Toyomura's DUI conviction obviously subjected him to possible punishment, *see* HRS § 291-4(b) (1993), any punishment meted out was not "additional" to the consequences of his administrative driver's license revocation, the latter, as noted, being "nonpunitive and purely remedial."

We therefore hold that *Dow* fails to establish that Toyomura has been subjected to "multiple punishments for the same offense."

### 4. *Summary*

In sum, because Toyomura has speciously denominated the needs assessment and alcohol abuse and dependence treatment provisions of HRS § 286-261(d) as "punishments" for past behavior, rather than as permissible preconditions to the prospective privilege of relicensure, he has incorrectly challenged his criminal DUI prosecution under double jeopardy principles. We therefore affirm the district court's denial of Toyomura's pretrial motion to dismiss.

### B. *Officer Fujihara's Opinion Testimony*

"In Hawai'i, admission of opinion [testimony] is a matter within the discretion of the trial court, and only an abuse of that

discretion can result in reversal." *State v. Tucker,* 10 Haw.App. 73, 89, 861 P.2d 37, 46, *reconsideration denied,* 9 Haw.App. 660, 894 P.2d 117, *cert. denied,* 75 Haw. 582, 863 P.2d 989 (1993) (citing *Sherry v. Asing,* 56 Haw. 135, 148, 531 P.2d 648, 658 (1975)). "Generally, to constitute an abuse [of discretion,] it must appear that the [trial] court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Gaylord,* 78 Hawai'i at 144, 890 P.2d at 1184 (citation omitted).

Acknowledging the abuse of discretion standard of review, Toyomura urges that the district court erred "in permitting Officer Fujihara to testify about whether [he, *i.e.,* Toyomura] failed the [FSTs], whether [he] was intoxicated, and whether [his] BAC was in excess of .10% ... and in relying on this testimony to convict [him]." Toyomura's opening brief at 5. Specifically, Toyomura relies on *State v. Nishi,* 9 Haw.App. 516, 852 P.2d 476 (1993), in making the following argument:

[A] police officer may not testify, without proper foundation, about his opinion about whether a DUI defendant is intoxicated ... based on [FSTs].... In *Nishi* there was literally no evidence about the officer's training in administering and interpreting the [FSTs]. In this case, the only foundation laid was that Officer Fujihara had been trained in 1982 by the people from the National Highway Safety Traffic Administration and later from the [Honolulu Police Department's] Training Division.... There was no ... testimony about the officer's training other than these bare facts. There was no testimony about what the training consisted of or what the officer was told about interpreting the field sobriety tests or why the tests could be interpreted in certain ways or what the scientific basis was for interpreting the tests. The officer was never qualified as [an] expert or offered as an expert by the [prosecution] until the [prosecution] asked him ... questions ... over defense objections. In fact, when Officer Fujihara first started testifying about the [FSTs], defense counsel objected, and the Court stated that it would only consider the offi-

cer's testimony as a "lay" witness.... In direct contradiction to this statement by the Court, the Court later allowed Officer Fujihara to testify as an expert and give his opinion. Officer Fujihara stated that his opinion was based on his observations *and on the field sobriety test....* Worse still, the Court later stated that it definitely relied on all of the testimony of Officer Fujihara in convicting [Toyomura]. In *Nishi,* the [Intermediate Court of Appeals, *i.e.,* the] ICA found harmless error because the trial court specifically stated that it did not rely on the officer's opinions in convicting the Defendant in that case. In this case, by contrast, [the trial court] told [Toyomura] that the accident caused by [Toyomura] was not enough to convict him, and the Court had to rely on *"everything"* that he heard from both officers to convict [him]....

There is simply no question that the rule in *Nishi* was violated in this case, and [Toyomura's] conviction must be reversed and a new trial ordered if this case is not dismissed on Double Jeopardy grounds.

Toyomura's opening brief at 7–8 (citation and record references omitted) (emphases in original).

Although it is facile and seductive, Toyomura's argument fails to establish that his DUI conviction must be vacated and the matter remanded for a new trial.

In *Nishi,* the district court convicted the defendant (Nishi), *inter alia,* of DUI, in violation of HRS § 291–4(a)(1). On appeal, Nishi contended that the district court had committed reversible error when it allowed the arresting police officer to render an opinion as to the results of the FSTs that he had administered to Nishi. Affirming the conviction, the *Nishi* court reasoned as follows:

Hawaii Rules of Evidence (HRE) Rule 701 provides as follows:

**Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear

understanding of the witness' testimony or the determination of a fact in issue.

The commentary to HRE Rule 701 states that Rule 701 "retains the common-law requirement that lay opinion be based upon firsthand knowledge[.]" Thus, for ... opinion testimony to be admissible under HRE Rule 701, "the witness must have personal knowledge of matter than forms the basis of testimony of opinion; the testimony must be based rationally upon the perception of the witness; and of course, the opinion must be helpful to the jury (the principle test)." 1 J. Strong, *McCormick on Evidence* (hereafter *McCormick* ) § 11, at 45–46 (4th ed. 1992) (footnotes omitted). The "rational" test means whether the opinion "is one which a normal person would form on the basis of the observed facts." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* (hereafter *Weinstein's Evidence* ) ¶ 701[02], at 701–18 (1992) (footnote omitted). Also, "where relevancy requires, a foundation must be laid as to the witness' personal knowledge of facts to which the observed facts are being compared." *McCormick* § 11 at n. 22. Finally, "Rule 701 is a rule of discretion." *Weinstein's Evidence* ¶ 701[02] at 701–31. We apply the foregoing principles in analyzing [Nishi's] contention.

"[A] lay witness may express an opinion regarding another person's sobriety, provided the witness has had an opportunity to observe the other person." *State v. Murphy*, 451 N.W.2d 154, 155 (Iowa 1990). However, the [Hawai'i] Supreme Court [has] observed that:

> "[F]ield sobriety tests are designed and administered to avoid the shortcomings of casual observations. 1 Am. J.Crim.L. 96 (1967)." *State v. Arsenault*, 115 N.H. 109, 111, 336 A.2d 244, 246 (1975). "They are premised upon the relationship between intoxication and the externally manifested loss of coordination it causes." *Id.* at 113, 336 A.2d at 247. They essentially require a suspected driver to go through prescribed routines so his physical characteristics may be observed by the police.

*State v. Wyatt*, 67 Haw. 293, 302, 687 P.2d 544, 551 (1984). In [Hawai'i], it is common knowledge that, where a police officer reasonably believes that a motorist is DUI, the officer will order him [or her] out of the car and administer [FSTs] to the motorist with his [or her] consent. Police departments conduct training sessions for police officers relating to the administering of [FSTs] and print and issue to officers [FST] work sheets containing instructions to be given to motorists undergoing these tests. *In re Doe*, 9 Haw.App. 406, 408–09, 844 P.2d 679, 681 (1992). . . .

The [prosecution] argues that [the arresting officer's] opinion testimony that "[Nishi] failed the [FST] was rationally based upon his perception of [Nishi] on the night of his arrest[,] ... [and] the testimony was helpful to understanding [the arresting officer's] conclusions regarding [Nishi's] physical condition." The [prosecution] therefore concludes that [the arresting officer's] opinion testimony met the requirements of HRE Rule 701 and was properly admitted into evidence. We do not believe that the opinion testimony met the rationality test.

Here, [the arresting officer] did not merely testify that based on his perception of [Nishi's] lack of coordination he was of the opinion that [Nishi] was intoxicated. Rather, the officer's opinion was that [Nishi] failed to pass the [FSTs] that [Nishi] had undertaken to perform. A normal person may not necessarily form such an opinion if he or she had not been taught to grade the performance of the three [FSTs]. In other words, this was a situation where foundational evidence as to [the arresting officer's] knowledge of HPD's field sobriety testing procedures was necessary. The record discloses no foundational evidence in this regard.

Accordingly, we conclude that the district court abused its discretion in admitting [the arresting officer's] opinion testimony into evidence. However, the admission of [the arresting officer's] opinion testimony did not prejudice [Nishi] and was harmless error.

In this case, the court, not a jury, was the trier of fact. The record clearly discloses that the court did not consider or rely upon [the arresting officer's] opinion testimony. The court stated:

> I'm not really, frankly, looking at the officer's specific evaluation. I'm evaluating the picture that I get of what [Nishi] did that day.
>
> . . . .
>
> [Nishi's] balance was extremely poor from what I can see here. He had balance and coordination problems on every one of the tests.

Consequently, although [the arresting officer's] opinion testimony was improperly admitted into evidence, it was harmless error.

*Nishi,* 9 Haw.App. at 521–24, 852 P.2d at 479–80 (footnotes omitted) (some brackets in original).

We now apply the *Nishi* analysis, which we hereby expressly adopt and approve, to the facts of the present case.

■ Toyomura is correct in his assertion that "a police officer may not testify, *without proper foundation,* about his opinion about whether a DUI defendant is intoxicated ... based on [FSTs]" (emphasis added). *See Nishi,* 9 Haw.App. at 523, 852 P.2d at 480. Toyomura is also correct in observing that insufficient foundation was laid to permit Officer Fujihara, *based on Toyomura's performance of the FSTs,* to render a lay opinion as to whether he was intoxicated, inasmuch as the prosecution elicited no testimony establishing that (1) the horizontal gaze nystagmus, "one-leg stand," and "walk-and-turn" procedures were elements of the HPD's official FST protocol, (2) there was any authoritatively established relationship between the manner of performance of these procedures and a person's degree of intoxication, and (3) Officer Fujihara had received any specific training in the administration of the procedures and the "grading" of their results. *See id.* Therefore, *Toyomura* is correct that Officer Fujihara was improperly permitted to render an opinion that he (*i.e.,* Toyomura) was intoxicated based in part on Officer Fujihara's assessment of the results of the FSTs. *See id.* at 523–24, 852 P.2d at 480. Finally, Toyomura is correct in his assertion that Officer Fujihara was neither properly offered as an expert witness [19] nor regarded as such by the district court, which expressly stated that (1) it was considering "only ... the observations of the officer" and "not his grading" of the FSTs themselves and (2) it would consider Officer Fijihara's testimony "from a lay point of view."

■ Toyomura is simply wrong, however, in concluding that "the rule in *Nishi* was violated in this case" in such a manner as to require that his DUI conviction be vacated. As the trial court correctly noted, "any ... lay person," including a police offi-

---

19. Hawai'i Rules of Evidence (HRE) Rule 702 provides as follows:

> **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert by knowledge, skill, experience, training, or education* may testify thereto in the form of an opinion or otherwise.

In *Larsen v. State Sav. & Loan Ass'n,* 64 Haw. 302, 640 P.2d 286 (1982), the Hawai'i Supreme Court specified three decisions the trial court must make before admitting expert testimony into evidence. They are that (1) *the witness is in fact an expert;* (2) the subject matter of the inquiry is of such a character that only persons of skill, education, or experience in it are capable of a correct judgment as to any facts connected therewith; and (3) the expert testimony will aid the [trier of fact] to understand the evidence or determine a fact in issue. *See State v. Castro,* 69 Haw. 633, 756 P.2d 1033 (1988).

> With respect to decision (1), the *Larsen* court said:
>
> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, ... but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.... Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.
>
> *Larsen,* 64 Haw. at 304, 640 P.2d at 288 (citations and footnote omitted).

*State v. Cababag,* 9 Haw.App. 496, 503–04, 850 P.2d 716, 720–21, *cert. denied,* 74 Haw. 652, 853 P.2d 542 (1993) (ellipsis points in original) (emphases added).

cer, "can have an opinion regarding sobriety." *See id.* at 522, 852 P.2d at 479. As set forth above, Officer Fujihara expressly testified that, over the course of his approximately nineteen years as a police officer, he "had an opportunity to observe people who had been drinking and at different levels[.]" And, as noted, the record reflects that the trial court both assured Toyomura that he was considering Officer Fujihara's testimony "only from a lay point of view" and that the trial court applied its independent assessment of the evidence in finding Toyomura guilty of DUI. We have no reason to construe the trial court's statement that "everything" that it heard about Toyomura's condition on the evening in question "told" it that Toyomura was "drunk" constituted a breach of the trial court's promise. *See State v. Aplaca,* 74 Haw. 54, 65–66, 837 P.2d 1298, 1304–05 (1992) (presuming that trial court applied the correct standard of proof).

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). "Where there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless." *State v. Nakamura,* 65 Haw. 74, 80, 648 P.2d 183, 187 (1982) (citation and internal quotation marks omitted).

Examined in the light of the entire proceedings and given the effect that the whole record shows it to be entitled, we are convinced that there is no reasonable possibility that any improper lay opinion testimony on the part of Officer Fujihara contributed to Toyomura's DUI conviction. Accordingly, we hold that any error in the admission of that testimony was harmless.

### III. *CONCLUSION*

For the foregoing reasons, Toyomura's conviction is affirmed.